UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION,

                Plaintiff,

v.

FORD MOTOR COMPANY,

                Defendant.

Case No. 5:11-cv-13742

Hon. John Corbett O'Meara
Magistrate Judge Mark A. Randon

_____/

EQUAL EMPLOYMENT
 OPPORTUNITY COMMISSION
By:  Nedra D. Campbell (P58768)
Trial Attorney
Detroit District Office
Patrick V. McNamara Federal Building
477 Michigan Avenue, Room 865
Detroit, MI  48226
(313) 226-3410
nedra.campbell@eeoc.gov

KIENBAUM OPPERWALL
 HARDY & PELTON, P.L.C.
By:  Elizabeth P. Hardy (P37426)
     William B. Forrest III (P60311)
     Jennifer A. Zinn (P41469)
Attorneys for Defendant
280 N. Old Woodward Avenue, Suite 400
Birmingham, MI  48009
(248) 645-0000
ehardy@kohp.com
wforrest@kohp.com
jzinn@kohp.com

_____/

**DEFENDANT FORD MOTOR COMPANY'S MOTION FOR SUMMARY JUDGMENT**

Defendant, FORD MOTOR COMPANY ("Ford"), by and through its undersigned counsel, respectfully requests that the Court enter summary judgment in its favor, pursuant to Fed.R.Civ.P. 56, and dismiss Plaintiff's Complaint in its entirety with prejudice.

In its First Amended Complaint, Plaintiff EEOC alleges that Ford unlawfully failed to accommodate Charging Party Jane Harris when it denied her request to telecommute up to four days per week whenever she determined her Irritable Bowel Syndrome ("IBS") prevented her from leaving her home. Plaintiff also alleges that Ford's termination of Charging Party was in retaliation for her complaint regarding its denial of her requested accommodation.

Both of Plaintiff's claims must fail. Federal Rule of Civil Procedure 56(c) provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Summary judgment is appropriate when the moving party demonstrates that there is no genuine issue of material fact as to the existence of an essential element of the non-moving party's case on which the non-moving party would bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Martin v. Ohio Tpk Comm'n*, 968 F.2d 606, 608 (6th Cir. 1992). It is not sufficient for the non-moving party to "simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In order to defeat summary judgment, "[t]he plaintiff must present more than a scintilla of evidence in support of [its] position; the evidence must be such that a jury could reasonably find for plaintiff." *Michigan Protection and Advocacy Service, Inc. v. Babin*, 18 F.3d 337, 341 (6th Cir. 1994).

In the present case, because Charging Party was unable to establish regular and predictable attendance (she was absent some or all of 75% of the available workdays in 2009, the

year of her termination), Plaintiff EEOC cannot show that she is a qualified individual with a disability.  Therefore, for this reason alone, her failure to accommodate claim must fail. Alternatively, Plaintiff EEOC cannot sustain its failure to accommodate claim because Charging Party's requested accommodation, i.e., that she be permitted to telecommute up to four days per weeks on days when she determined her IBS prevented her from leaving her home, was not reasonable or effective in light of the interactive and team problem-solving nature of her job. Additionally, Plaintiff EEOC cannot show that Charging Party's termination was retaliatory when evidence of her declining performance pre-dates her complaint regarding the denial of her requested accommodation, and the evidence shows she failed to meet many of the basic objectives on her Performance Enhancement Plan.  For these reasons, Ford requests that the Court enter summary judgment in its favor and dismiss Plaintiff's complaint.  Ford relies upon the accompanying brief and exhibits in support of its motion for summary judgment.

On June 29, 2012, Ford's counsel sought concurrence from Plaintiff's counsel in the relief sought herein.  Plaintiff's counsel did not concur, necessitating the bringing of this motion.

<div style="margin-left:40%">

Respectfully submitted,

KIENBAUM OPPERWALL
 HARDY & PELTON, P.L.C.

By:  s/*Jennifer A. Zinn*
      Elizabeth P. Hardy (P37426)
      William B. Forrest III (P60311)
      Jennifer A. Zinn (P41469)
Attorneys for Defendant
280 N. Old Woodward Avenue, Suite 400
Birmingham, MI  48009
(248) 645-0000
jzinn@kohp.com

</div>

Dated:  June 29, 2012

166998

2

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION,

                                 Case No. 5:11-cv-13742

        Plaintiff,

                                 Hon. John Corbett O'Meara

v.                                Magistrate Judge Mark A. Randon

FORD MOTOR COMPANY,

        Defendant.

_____/

| | |
|---|---|
| EQUAL EMPLOYMENT<br>  OPPORTUNITY COMMISSION<br>By:  Nedra D. Campbell (P58768)<br>Trial Attorney<br>Detroit District Office<br>Patrick V. McNamara Federal Building<br>477 Michigan Avenue, Room 865<br>Detroit, MI  48226<br>(313) 226-3410<br>nedra.campbell@eeoc.gov | KIENBAUM OPPERWALL<br>  HARDY & PELTON, P.L.C.<br>By:  Elizabeth P. Hardy (P37426)<br>    William B. Forrest III (P60311)<br>    Jennifer A. Zinn (P41469)<br>Attorneys for Defendant<br>280 N. Old Woodward Avenue, Suite 400<br>Birmingham, MI  48009<br>(248) 645-0000<br>ehardy@kohp.com<br>wforrest@kohp.com<br>jzinn@kohp.com |

_____/

**BRIEF IN SUPPORT OF DEFENDANT FORD MOTOR COMPANY'S
<u>MOTION FOR SUMMARY JUDGMENT</u>**

# TABLE OF CONTENTS

Page

STATEMENT OF QUESTIONS PRESENTED ........................................................... ii

CONTROLLING OR MOST APPROPRIATE AUTHORITY .................................. iii

I.     INTRODUCTION ............................................................................................. 1

II.    FACTUAL BACKGROUND ............................................................................ 3

       A.     Charging Party's Resale Buyer Position. ............................................... 3

       B.     Charging Party's Chronic Absenteeism And Ford's Efforts To
              Assist Her. .............................................................................................. 5

       C.     Charging Party's 2009 Absenteeism Record. ........................................ 7

III.   LEGAL ANALYSIS ....................................................................................... 15

       A.     Plaintiff Cannot Make Out A *Prima Facie* Case For Failure To
              Accommodate Because Charging Party Is Not A Qualified
              Individual With A Disability Due To Her Excessive Absenteeism,
              And The One Accommodation Request She Made Was Not
              Reasonable. ........................................................................................... 15

       B.     Charging Party Is Not A Qualified Individual Due To Her
              Excessive Absenteeism. ........................................................................ 16

       C.     Charging Party's Requested Accommodation Was Not
              Reasonable. ........................................................................................... 18

       D.     Plaintiff Cannot Present Any Evidence Of A Causal Connection
              Between Charging Party's Complaint That She Had Been Denied
              A Reasonable Accommodation And Her Termination. .......................... 21

       E.     Plaintiff Lacks Evidence That Ford's Articulated Non-
              Discriminatory Reason For Establishing The PEP And
              Terminating Charging Party Was Pretextual. ....................................... 22

IV.    CONCLUSION ............................................................................................... 24

## STATEMENT OF QUESTIONS PRESENTED

Whether Plaintiff EEOC can show Charging Party Jane Harris is a qualified individual with a disability when she was unable to establish regular and predictable attendance in that she was absent some or all of 75% of the available workdays in 2009, the year in which she was terminated?

Whether Plaintiff EEOC can show Charging Party's requested accommodation, i.e., that she be permitted to telecommute up to four days per week whenever she determined her Irritable Bowel Syndrome ("IBS") prevented her from leaving her home, was reasonable in light of the interactive and team problem-solving nature of her job?

Whether Plaintiff EEOC can show that Charging Party's termination was retaliatory when evidence of Charging Party's declining performance pre-dates her complaint regarding the denial of her requested accommodation, and she failed to meet many of the basic objectives on her Performance Enhancement Plan?

Defendant answers "No" to all of the above.

# CONTROLLING OR MOST APPROPRIATE AUTHORITY

Page(s)

**Cases**

*Braithwaite v. The Timken Co.*,
   258 F.3d 488 (6th Cir. 2001) ......................................................... 24

*Brenneman v. MedCentral Health System*,
   366 F.3d 412 (6th Cir. 2004) .............................................. 16, 17, 18

*Chandler v. City of Dallas*,
   2 F.3d 1385 (5th Cir. 1993) ........................................................... 16

*Chandler v. Specialty Tires of America*,
   283 F.3d 818 (6th Cir. 2002) ......................................................... 22

*Chen v. Dow Chemical Company*,
   580 F.3d 394 (6th Cir. 2009) .................................................... 23, 24

*Colon-Fontanez v. Municipality of San Juan*,
   660 F.3d 17 (1st Cir. 2011) ...................................................... 16, 18

*Hypes v. First Commerce Corp.*,
   134 F.3d 721 (5th Cir. 1998) ......................................................... 20

*Johnson v. Cleveland City School Dist.*,
   443 Fed. Appx. 974 (6th Cir. 2011) .............................................. 16

*Lindsey v. Whirlpool Corp.*,
   295 Fed. Appx. 758 (6th Cir. Oct. 2, 2008) ................................. 22

*Mason v. Avaya Communications Inc.*,
   357 F.3d 1114 (10th Cir. 2000) .................................................... 19

*Payne v. Fairfax County*,
   2006 U.S. Dist. LEXIS 79725 (E.D. Va. 2006) ........................... 17

*Penny v. UPS*,
   128 F.3d 408 (6th Cir. 1997) ........................................................ 22

*Smith v. Ameritech*,
   19 F.3d 857 (6th Cir. 1997) .......................................................... 20

*Tuttle v. Metropolitan Government of Nashville*,
   474 F.3d 307 (6th Cir. 2007) ........................................................ 22

*Tyndall v. National Educ. Ctrs., Inc.,*
    31 F.3d 209 (4th Cir. 1991) ........................................................................ 17

*US Airways, Inc. v. Barnett,*
    535 U.S. 391 (2002) ............................................................................... 19

*Vorachek v. Security Federal Credit Union,*
    2009 U.S. Dist. LEXIS 111408 (E.D. Mich. 2009) .......................... 17

*Waggoner v. Olin Corp.,*
    169 F.3d 481 (7th Cir. 1999) ....................................................... 17

*Wells v. Shalala,*
    228 F.3d 1137 (10th Cir. 2000) .................................................. 20

**Statutes**

42 U.S.C. §12203(a) ......................................................................... 21

**Regulations**

29 C.F.R. §1630.2(m) ..................................................................... 16

29 C.F.R. §1630.2(n)(1) .................................................................. 19

## I.    INTRODUCTION

Plaintiff Equal Employment Opportunity Commission ("Plaintiff EEOC") alleges Ford violated the Americans with Disabilities Act ("ADA") when it denied Charging Party Jane Harris' request to work from home "up to four days per week" whenever she determined her Irritable Bowel Syndrome ("IBS") prevented her from leaving her home.  Plaintiff also alleges that Ford retaliated against Charging Party when she was terminated in September 2009 after failing to meet basic objectives on a Performance Enhancement Plan ("PEP").

According to Charging Party, she suffers from IBS[1] and by 2009 her IBS flare-ups, in addition to an array of other medical and personal issues, prevented her from coming to work well over half of her working time.  Ford denied Charging Party's request to work from home because it determined that it would not be an effective or reasonable accommodation in that she could not perform the essential functions of her resale buyer position if she was working at home an unpredictable "up to four days per week."  Charging Party's position, which was on the Raw Material team within Ford's Purchasing organization, required her to interact frequently on a face-to-face basis with Ford's suppliers, her management team and coworkers, and others within Ford.  It was also essential that she be available to respond to unforeseen and time-sensitive situations that directly impacted the supply of steel to Ford's stampers, and in turn, their supply of parts to Ford's manufacturing plants.  It was not a position that could be performed at a remote location on an irregular schedule – and certainly not one that allowed being out of the workplace up to four days a week.  In lieu of Charging Party's request, Ford offered to move her work space closer to the restroom and suggested that she consider moving to a different job

---

[1] For purposes of this motion only, Ford will assume Charging Party has IBS.

1

which might be more amenable to telecommuting. Charging Party rejected both of these suggestions.

In 2009, Charging Party was absent from work over 50% of the available full workdays. With her partial day absences, she missed some or all of 75% of the available workdays. This was part of a long-term absenteeism pattern that worsened over time and took a toll on her ability to perform the essential duties of her job and provide reliable and predictable support for her management team and coworkers. Because of her frequent absences, her coworkers were regularly required to assume responsibility for her time-sensitive assignments, correct her errors, and otherwise perform a substantial portion of her job responsibilities in addition to their own. Her performance also suffered in the process. In an effort to clearly set forth what she needed to do to improve her performance and maintain employment, her management team created a Performance Enhancement Plan ("PEP") in July 2009. It included very basic assignments, most of which had been on prior performance reviews, with measurable objectives and achievable deadlines for accomplishing those objectives. Instead of working hard to demonstrate she was committed to her job, Charging Party was late on a number of assignments, and failed to meet numerous of her PEP objectives. Based on her lackluster performance, Lisa King, Director Global Commodity, Raw Material and Stamping, terminated her employment. Charging Party was given the opportunity to demonstrate she could perform the basic responsibilities of her job, and had been specifically warned that termination would occur if she did not meet her objectives.

Based on the record evidence, Plaintiff cannot establish that Charging Party's termination was due to anything other than her declining performance over time and her abysmal performance on the PEP. Additionally, Charging Party is not a "qualified individual" under the ADA given her excessive absenteeism and her requested accommodation was not reasonable

because her position could not be performed with the conditions she sought to impose. Accordingly, Ford seeks summary judgment as to these claims pursuant to Fed.R.Civ.P. 56(c).

## II.     FACTUAL BACKGROUND

### A.     Charging Party's Resale Buyer Position.

Charging Party worked for Ford from April 2003 through September 10, 2009 as a resale buyer on the Raw Material team within the Body & Exterior Department of Vehicle Production Purchasing.  The Resale group within the Raw Material team consisted of approximately five to seven resale buyers.  (Exh 1, Gordon Dec ¶2)  Charging Party's immediate supervisor was Dawn Gontko from the time of her hire until early 2006 when John Gordon became her supervisor. (Exh 2, Gontko Dec ¶2)  Mike Kane, Senior Purchasing Manager for Raw Material, and Lisa King, Director Global Commodity, Raw Material and Stamping, were consistently part of Charging Party's management team.  (Exh 3, Jirik Dec ¶17)

As a resale buyer, Charging Party purchased steel from steel suppliers (i.e., steel sources) and resold it to Tier I stampers who then manufacture and supply vehicle parts to Ford's assembly plants.  Charging Party, along with the other resale buyers, was assigned specific stampers for whom she had responsibility to source steel.  In order to source steel, the buyers, stampers and steel sources all had access to a database and procurement system known as eRMA.  The stamper starts the process of obtaining the steel by entering a Material Specification Sheet ("MSS") in the eRMA system that details the steel specifications.  The resale buyer receives notification of the MSS and selects a steel source consistent with Ford's overall steel sourcing strategy.  The resale buyer then processes the MSS by generating a purchase order for the steel source.  After the steel is sourced, the resale buyer's job is to ensure that there is no gap in the steel supply, respond to supply issues such as steel shortages and changes in steel

specifications, and facilitate quality or pricing disputes between the stampers and the steel sources. (Exh 1, Gordon Dec ¶¶3, 4)

The resale buyer job is highly interactive. The buyer is the intermediary between two suppliers (the steel source and the stamper) and must ensure that the steel requirements are understood and translated correctly. The interaction between the buyer and the suppliers is most effectively performed face to face and often incudes supplier site visits. In addition, the buyer is required to interface with an array of different external and internal stakeholders to engage in problem-solving dialogues. Those stakeholders include: steel sources, Tier I stampers, parts engineers, part buyers, material engineers, lean manufacturing specialists, and others on the Raw Material team within Purchasing. (Exh 1, Gordon Dec ¶5) Lisa King, a Director in Purchasing as of Charging Party's termination, described the job as follows:

> In a buyer's role, as I described to you in my role when I first joined the steel team, there is an element that is project and interaction based, whether it be suppliers or plants, but all of the stakeholders within Ford. And then there is an administrative path that supports that. On any given day, depending on the activities that need to be completed, you can be at different stages of those interactions. So you can have days that are highly interactive. You're barely at your desk. You're working with a lot of people. It's a very interactive environment.
>
> There are other days when you get a quieter day and you may be on your computer doing more work on the computer and more based in that type of portion of your role.

(Exh 4, King dep at 43)

Not only is the resale buyer job highly interactive, it is also reactive and fluid.

Lisa King testified:

> Because we are part of the operational pipeline of the company of keeping vehicles moving down a manufacturing line and keeping the product development factory itself moving, the nature of our

4

> role is that it's a very fluid environment, and we could be doing
> any of those things on any day.

(Id.)

King further acknowledged that many buyer interactions occur via email but, at least in urgent situations, "[t]he core of the problem-solving isn't happening through e-mail or through anything other than a team coming together to problem-solve."  And, she further explained that, "when the team can come together face to face, that would typically be what the team would do." (Exh 4, King dep at 47-48)

2008 and 2009 were particularly challenging years for the Raw Material team because a number of stampers went out of business or were absorbed by other stampers.  The steel industry was also in turmoil.  There was a global steel shortage in 2009 and a number of steel suppliers went under.  These conditions created more emergency situations, in which the resale buyers, suppliers and internal Ford constituencies were required to come together on short notice for problem-solving dialogues.  (Exh 1, Gordon Dec ¶6)

**B.    Charging Party's Chronic Absenteeism And Ford's Efforts To Assist Her.**

Charging Party had chronic attendance issues throughout most of her tenure at Ford due to an array of medical and personal problems.  She rebelled against the notion that Ford employees were expected to be at work for a standard workday and made repeated requests to work from home on an ad hoc basis, to begin her workday at some time other than her agreed-upon start time, or to have time worked on the weekends or after hours substitute for hours missed during her work schedule.  (Exh 3, Jirik Dec ¶¶3, 5; Exh 1, Gordon Dec ¶8)  From the very outset of her employment with Ford, Charging Party expressed a strong desire to avail herself of Ford's telecommuting program.  (Exh 5, Harris dep at 152-153)

Despite the business challenges fueled by Charging Party's frequent absences, her management team made a number of efforts, beginning with her first supervisor, Dawn Gontko, to accommodate her frequent absences.  After Charging Party returned from a medical leave of absence in February 2005, Ms. Gontko made a number of adjustments to help her establish regular and predictable attendance.  (Exh 2, Gontko Dec ¶3)  Gontko testified:

> What was a challenge during the period of time was her absenteeism and the ability to work regular working hours, and that affected the ability for the business to run effectively.  So actions were taken to accommodate the inconsistency of Jane's schedule.  And what I meant by that is, we had to take some work off her desk, give it to other people, and, because it was very sporadic what hours and what days, she would actually be working, it was difficult to manage the business.

(Exh 6, Gontko dep at 22)

Along with shifting work to others, Gontko permitted Charging Party a later start time on Mondays, permitted her to work from home on an ad hoc basis, reassigned time-sensitive assignments, and permitted her two trial Alternative Work Schedule ("AWS")/telecommute periods.  Despite these efforts, Ms. Harris' frequent absences continued.  At the conclusion of 2005, Gontko informed Ms. Harris that the AWS/telecommuting trials had failed and that she needed to achieve regular and predictable attendance.  Gontko also informed her that her frequent time out of the office was a hardship to the department.  Gontko then placed Ms. Harris on Workplace Guidelines.[2]  (Exh 2, Gontko Dec ¶¶3, 5)

In 2006, Gontko transferred to a different position and John Gordon replaced her. Gordon continued to make efforts to adjust to Charging Party's frequent absences.  He routinely

---

[2] Workplace Guidelines are a supervisor's tool whereby employees with attendance issues are required to follow certain call-in and reporting procedures in connection with time away from work and are required to provide medical excuses in the event there is a medical reason underlying a particular absence.  (Exh 3, Jirik Dec ¶3)

assumed her job responsibilities or called upon Charging Party's coworkers to cover for her, which was a burden on them.  He also occasionally permitted her to work from home and/or "make up" work hours during non-business hours.  (Exh 1, Gordon Dec ¶8)

**C.      Charging Party's 2009 Absenteeism Record.**

Charging Party's already serious attendance problems worsened in 2009 to the point where she missed 50% of full workdays and some or all of 75% of the available workdays.[3]  By mid-July 2009, she had exhausted her FMLA entitlement for the year, had fully exhausted her 80 hours of paid sick and personal business days for the year, had taken a number of additional sick days, and had used vacation days.  (Exh 1, Gordon Dec ¶10)

Charging Party's excessive absenteeism required that her coworkers be available to assume her responsibilities and fix her mistakes.  The unpredictability of her frequent absences meant that on any given day any one of the team members might need to set aside their own work to assume her responsibilities, not knowing if they would be filling in for the day or several days.  The Raw Material team was working under adverse circumstances in the 2008/2009 time frame due to the economic turmoil in the automotive industry and supply base, and the disruption to their schedules and added workload created a great deal of increased stress and morale problems.  (Exh 7, Pompey Dec ¶4; Exh 8, Radl Dec ¶7; Exh 1, Gordon Dec ¶8)

**D.      Charging Party's Request To Telecommute As An Accommodation.**

Despite the adjustments made by her management, Charging Party's attendance did not improve.  Not only were her frequent full and partial day absences a burden to her coworkers, Gordon had to repeatedly remind her to account for all absence time on her time card, track her

---

[3] John Gordon created a calendar documenting her attendance record for the first seven months of 2009.  (Exh 1, Gordon Dec ¶10)

FMLA time, and that if she was home from work because she was too ill to come to work, then she should not be working.  (Exh 1, Gordon Dec ¶9)

In February 2009, Charging Party requested that she be permitted to telecommute as an accommodation for her IBS, presumably thinking that she could circumvent her attendance problems if she was deemed to be "working" at home (despite her IBS complications).  She made this request in an email to Leslie Pray of Human Resources in which she wrote, "Per my disability and Ford's telecommuting policy, I am asking Ford to accommodate my disability by allowing me to work up to four days per week from home."  (Exh 9, 2/19/09 email)  Ford has a Telecommuting Policy which permits employees to enter into an agreement with their supervisor to work from home under certain conditions.  The policy states very clearly that it is not an entitlement and it sets forth certain factors for managers to consider (such as the nature of the job and the employee's performance) in reviewing a telecommuting request.  It also provides that the approval to telecommute is within the discretion of an employee's management, that a specific telecommuting schedule should be agreed upon in advance, and that an employee with a telecommuting arrangement must be prepared to come into the office on telecommute days when the business or management requires it.  (Exh 3, Jirik Dec ¶7; Exh 10, Telecommuting Policy)

In response to Charging Party's accommodation request, Karen Jirik from Personnel Relations scheduled a meeting to discuss her request and included Gordon and Leslie Pray.  At that meeting, they discussed the specifics of the accommodation request, Gordon reviewed the responsibilities of the resale buyer job, and they engaged in a dialogue with Charging Party regarding how and to what extent her job could be performed from a remote location.  (Exh 3, Jirik Dec ¶7)

Even though there were discrete parts of the job that could be performed remotely, the essence of the job was group problem-solving, which required that a buyer be available to interact with members of the resale team, suppliers and others to discuss open issues and resolve problems. (Exh 1, Gordon Dec ¶11) As Lisa King described, "[t]he core of the problem-solving isn't happening through e-mail or through anything other than a team coming together to problem-solve." (Exh 4, King dep at 48) Many of these interactions were unplanned and spur of the moment. A resale buyer's regular and predictable attendance at work and availability to participate in unplanned face-to-face interactions are essential to being a fully functioning member of the resale team. (Exh 1, Gordon Dec ¶11) Jirik listened to the dialogue, consulted with Gordon and Pray, and decided to deny the requested accommodation. (Exh 3, Jirik Dec ¶8)

Gordon and Jirik met with Charging Party again and explained that her job could not be performed with an unpredictable "up to four days per week" telecommuting schedule. As an alternative accommodation, Jirik suggested that they move her cubicle closer to the restroom and/or that she consider moving to a different job, which might be more amenable to telecommuting. (Exh 3, Jirik Dec ¶8) Charging Party rejected any alternative to telecommuting – and would not even consider "self-help" steps such as using Depends (the product specifically designed for incontinence issues) or bringing a change of clothes to the workplace. (Exh 3, Jirik Dec ¶8; Exh 5, Harris dep at 144-149)

### E.    Plaintiff's 2007-2008 Performance.

As did 80% of her peers, Charging Party received Excellent Plus ("EP") performance ratings for the first five years of her employment with Ford. In order to differentiate among the large group of employees receiving this rating, managers meet twice a year in "related work group" meetings to further assess employees from highest to lowest as "EP1," "EP2," or "EP3."

9

These ratings, known as "contribution assessments," do not appear on employees' performance reviews, but are maintained as part of the performance review process. Management also uses the "Job Related Skills" and "Employee Development" portion of the written performance review to identify areas where improvement is needed. The ratings and commentary in these sections may be used to "send a message" to employees about performance deficiencies in order to provide an opportunity to improve before the overall rating is reduced. (Exh 3, Jirik Dec ¶15; Exh 1, Gordon Dec ¶13)

In 2007, Charging Party's contribution assessment was an "EP3," placing her in the bottom 22% of her peer group. In 2008, she was assessed as being in the bottom 10% of her peers. (Exh 1, Gordon Dec ¶13) In this same time period, she received low ratings for most of the "Job Related Skills" on her written performance review. For instance, in 2007, she received the second lowest rating or lower in 7 of 11 of the skills areas (Exh 11, 2007 Performance Review), and in 2008 she received the second lowest rating or lower in 9 of 11 of the skills areas. (Exh 12, 2008 Performance Review) This was a significant drop from her 2006 ratings. (Exh 13, 2006 Performance Review)

In 2007, Gordon and Mike Kane (Gordon's manager) also noted issues with her written and oral communications and interpersonal skills in the "Employee Development" portion of her review. Gordon and Kane noted that, "Jane can be argumentative and does not respond to coaching from her supervisor regarding disruptive behaviors. Additionally, she has on a number of occasions unnecessarily escalated relatively minor issues, disrupting her work as well as the work of her teammates." (Exh 11, 2007 Performance Review)

F.      2009 Interim Performance Review.

Charging Party's performance issues continued and, in fact, worsened in 2009. She was not keeping up with the core functions of her job, her interpersonal skills continued to be problematic, she lacked a concern for quality, and had difficulty delivering timely results. She was not performing the basic functions of her position and consequently was rated "lower achiever" in her 2009 mid-year/interim review. This again placed her in the bottom 10% of her peers. (Exh 1, Gordon Dec ¶14; Exh 14, Kane Dec ¶¶4, 5)

A number of specific performance deficiencies were identified on Charging Party's 2009 interim review, such as her failure to keep current with respect to "MSS's" and Material Claims "MC's." (Exh 15, 2009 Interim Review) MC's are communications from either the steel source or the stamper describing a dispute between them. It is the buyer's responsibility to act as a facilitator and resolve those claims. The timely processing of MSS's and MC's is a key objective of the resale buyer position, as Charging Party admits. (Exh 1, Gordon Dec ¶15)[4]

Charging Party also admits that in April 2009 she processed a number of MSS's with incorrect pricing. This occurred when Martinrea, a stamper for whom Charging Party had responsibility, assumed another supplier, SKD. Because the stamper location had changed, the pricing on the purchase orders issued by Charging Party should have been changed to reflect increased freight costs. Charging Party, however, copied the prior purchase orders without changing the freight costs. (Exh 5, Harris dep at 226-228) This created issues for the steel source, Taylor Steel, as the pricing was incorrect. (Exh 1, Gordon Dec ¶16)

---

[4] The timely processing of MSS's and MC's was consistently included in the objectives for all resale buyers. As of the time of her 2009 interim review, it is undisputed that Charging Party had 19 MSS's older than 120 days and 14 unresolved MC's older than 90 days. (Exh 1, Gordon Dec ¶22)

Charging Party does not dispute these errors, claiming she was so overwhelmed with work that she could not process the MSS's during the workweek when the pricing information would have been immediately available.[5]   (Exh 5, Harris dep at 226-228, 355)   Yet, she exacerbated her errors by neglecting to correct the information or documenting there were errors needing correction.  (Exh 1, Gordon Dec ¶16; Exh 5, Harris dep at 441-442)  She also ignored a direct communication from the steel source, Taylor Steel, the Monday after the weekend when she processed the MSS's, informing her that the pricing was incorrect, providing her with the correct pricing information, and asking that it be fixed.  (Exh 16, email 4/20/09)  Ultimately, Gordon learned of the error weeks later when Taylor Steel contacted him directly requesting that the error be corrected, which Charging Party's coworker, Tim Clawson, promptly did.  (Exh 1, Gordon Dec ¶16)

This incident is an example of Charging Party failing to perform core job functions.  She chose to process multiple purchase orders over the weekend when she knew the steel source would not be available to provide the correct pricing information.  She knowingly processed those orders with incorrect pricing, made no effort to correct the errors, and then ignored the steel source's direct request that the errors be corrected.

"Difficulty working with others" was also noted on her 2009 interim review.  A case in point was her conduct in a May 5, 2009 team meeting when – at the prompting of Charging Party's coworkers – the issue of workload burden on Charging Party's backup, Stephanie Radl (then Brown-Borden), was raised.  The suggestion was made to permanently divide Charging Party's suppliers among the team so that one buyer would not bear the brunt of her frequent and

---

[5] Charging Party also asserted that she was trying to avoid a "gap in supply" or a plant shutdown. But, there was no imminent danger of either a supply gap or a plant shutdown, as Charging Party essentially conceded in her deposition.  Furthermore, no plant shutdown occurred despite the lengthy delay caused by Charging Party's purchase order errors.  (Exh 5, Harris dep at 355, 361)

unpredictable absences.  No one referenced Charging Party's disability or medical issues. Nevertheless, apparently unable to understand the legitimate concern being raised, Charging Party immediately became confrontational with her supervisor and coworkers and abruptly left the meeting.  She was then observed screaming and crying in the women's restroom.  (Exh 1, Gordon Dec ¶19; Exh 8, Radl Dec ¶8; Exh 7, Pompey Dec ¶7)

> ### G.     Performance Improvement Efforts.

Despite the ongoing performance and behavioral issues, management elected to engage in an extensive effort to turn around Charging Party's performance in lieu of termination.  Her management team (Lisa King, Kane and Gordon) worked together to create a Performance Enhancement Plan, which provided easily achievable objectives with specific deadlines tied to the essential functions of her buyer position.  (Exh 14, Kane Dec ¶¶5, 6)  Charging Party was also informed that her performance on the PEP would be reviewed after 30 days and, in the absence of significant improvement, her employment was in jeopardy.  (Exh 15, 2009 Interim Review)

> ### H.     Charging Party's Performance Against The PEP.

The objectives on the PEP were consistent with those prepared for Charging Party's 2009 Performance Review; she was to stay current with respect to MSS's and MC's, complete assignments which had been languishing, and improve the manner in which she worked with others.  Charging Party's management made sure that the objectives and time frames were easily achievable if she put forth the effort.  (Exh 14, Kane Dec ¶6; Exh 1, Gordon Dec ¶21)

The very first objective on Charging Party's PEP was to manage her "work queue" by ensuring all MC's were resolved within 90 days and all MSS's were processed within 120 days. As described above, this is a fundamental part of the resale buyer's position.  At the outset of the

PEP period, Charging Party had 14 MC's older than 90 days.  She made no progress against this objective.  Instead, the aged claims had grown to 18 by the end of the 30-day PEP period.  As to MSS's older than 120 days, she made only nominal progress (they were reduced by only two – from 19 to 17).  (Exh 1, Gordon Dec ¶22; Exh 17, PEP)  Charging Party has no basis to dispute these numbers.  (Exh 5, Harris dep at 261-262)

Another objective, which was a carryover from the first half of 2009, was to schedule an internal training session, known as a "CMU" session, for the Raw Material team.  This objective required Charging Party to canvass the other buyers for training ideas, identify a subject matter expert within the company to conduct the training, and then schedule the session.  It was a simple task, and Kane and Gordon attempted to assist her by making a number of suggestions regarding training topics.  Inexplicably, at the conclusion of the 30-day PEP period, the objective had not been met.  (Exh 1, Gordon Dec ¶23; Exh 17, PEP)  Charging Party does not dispute that the training session had only tentatively been scheduled.  (Exh 5, Harris dep at 277-279)

Another objective Charging Party failed to meet was to update the Buyer Responsibility Matrix.  This had been one of Charging Party's ongoing responsibilities for several years.  In order to accomplish this task, Charging Party had to check with a limited group of buyers to determine if the lists of stampers assigned to them on the one-page matrix were accurate and/or complete.  The information on this matrix was then to be included in the eRMA system.  At the conclusion of the 30-day PEP period, the assignment was incomplete.[6]  (Exh 1, Gordon Dec ¶18; Exh 17, PEP)

A further objective, which dates back to 2008, was to develop a plan to correctly align end item part information in the eRMA system.  The ultimate solution involved a long-term goal,

---

[6] Even though Charging Party testified she "turned in" a matrix, she is not in a position to dispute the matrix was inaccurate.  (Exh 5, Harris dep at 481)

but the immediate PEP objective was to present a work plan that would set forth a timetable for project completion, identify the individuals with whom Charging Party would interface, and list the information she would need.  Charging Party admits that she failed to provide this work plan to Gordon or Kane.  (Exh 1, Gordon Dec ¶25; Exh 17, PEP; Exh 5, Harris dep at 468-470)

> **I.    Charging Party's Termination.**

During the 30-day PEP period, Gordon scheduled weekly one-on-one meetings with Charging Party to review progress on the stated objectives.  He then summarized her progress in communications to Kane, Pray and Jirik.  (Exh 1, Gordon Dec ¶26)  Lisa King testified to various meetings throughout the PEP period and she was involved in the discussions regarding "how do we react to what we've seen during the 30-day period."  (Exh 4, King dep at 68)  At the end of the 30-day period, it was clear that Charging Party had failed to meet many of the objectives on the PEP, and was late with respect to others.  (Exh 14, Kane Dec ¶7; Exh 17, PEP) Lisa King then made the decision that termination was warranted given that Charging Party was not meeting generally the performance criteria for the position, or the PEP specifically.  (Exh 4, King dep at 33)  At the time King made her decision, Gordon was on vacation.  He was not consulted regarding the termination decision, and, in fact, learned of it when Kane called him on vacation and directed him to conduct the termination meeting upon his return.  (Exh 14, Kane Dec ¶8)

### III.    LEGAL ANALYSIS

> **A.    Plaintiff Cannot Make Out A *Prima Facie* Case For Failure To Accommodate Because Charging Party Is Not A Qualified Individual With A Disability Due To Her Excessive Absenteeism, And The One Accommodation Request She Made Was Not Reasonable.**

Plaintiff EEOC's first claim against Ford is that it violated the ADA when it failed to provide Charging Party with her unpredictable "up to four days per week" telecommuting

request.  In order to establish a *prima facie* case for failure to accommodate under the ADA, a plaintiff must typically show that:  (1) the individual is disabled within the meaning of the Act; (2) she is otherwise qualified for the position, with or without reasonable accommodation; (3) her employer knew or had reason to know about her disability; (4) she requested an accommodation; and (5) the employer failed to provide the necessary accommodation." *Johnson v. Cleveland City School Dist.*, 443 Fed. Appx. 974, 982-83 (6th Cir. 2011).   In the present case, Plaintiff's failure to accommodate claim fails for two independent reasons; first, it cannot establish that Charging Party was otherwise qualified for her resale buyer position due to her excessive absenteeism, and second, her telecommuting accommodation was not reasonable.

### B.   Charging Party Is Not A Qualified Individual Due To Her Excessive Absenteeism.

Whether an individual is qualified under the ADA requires a two-step inquiry.  *See* 29 C.F.R. §1630.2(m).  The employee bears the burden to show, first, that she possesses the requisite skill, experience, education and other job-related requirements for the position, and second, that she is able to perform the position's essential functions with or without reasonable accommodation.  An essential function is one that "bear[s] more than a marginal relationship to the job at issue."  *Chandler v. City of Dallas*, 2 F.3d 1385, 1393 (5th Cir. 1993).  A number of circuit courts have recognized that "attendance is an essential function of any job."  *See Colon-Fontanez v. Municipality of San Juan*, 660 F.3d 17 (1st Cir. 2011) (which cites a number of cases holding that attendance is an essential function of a job).

In *Brenneman v. MedCentral Health System*, 366 F.3d 412 (6th Cir. 2004), the Sixth Circuit upheld summary judgment of the plaintiff's ADA claims on the grounds that the plaintiff had not met his burden that he was otherwise qualified for the pharmacy technician position he had held for 25 years due to his excessive absenteeism (it was undisputed that he had been absent

109 times in the preceding five years).  In upholding summary judgment, the Sixth Circuit relied on the fact that the plaintiff's excessive absences placed a great strain on coworkers in that replacements had to be found or the plaintiff's duties had to be assigned to coworkers to perform in addition to their own duties.  The court noted that "plaintiff's excessive absenteeism increased both employees' workloads and the department's pay-roll expenses and decreased the Pharmacy Department's morale" and held, "the record is replete with evidence of plaintiff's excessive absenteeism, which rendered him unqualified for that position."  *Id.* at 420

Numerous other decisions confirm that a plaintiff must demonstrate he is capable of regular and predictable attendance to be a qualified individual entitled to the protections of the ADA.  In *Vorachek v. Security Federal Credit Union*, 2009 U.S. Dist. LEXIS 111408 (E.D. Mich. 2009) (Exh 18), the court dismissed the plaintiff's ADA claims observing that, "an employee who cannot meet the attendance requirements of the job at issue cannot be considered a 'qualified' individual protected by the ADA." (citing *Tyndall v. National Educ. Ctrs., Inc.*, 31 F.3d 209, 213 (4th Cir. 1991)).  The court continued, "[T]he ADA does not obligate employers 'to tolerate erratic, unreliable attendance.'"  *Id.* (citing *Waggoner v. Olin Corp.*, 169 F.3d 481, 485 (7th Cir. 1999)).  Similarly, in *Payne v. Fairfax County*, 2006 U.S. Dist. LEXIS 79725 (E.D. Va. 2006) (Exh 19), the court addressed whether plaintiff was a "qualified individual," noting that:

> "[a]s to whether plaintiff could perform the essential functions of the job, this Court will assume, for purposes of this inquiry only, that Plaintiff's work performance was adequate.  However, our inquiry does not end there.  'In addition to possessing the skills necessary to perform the job in question, an employee must be willing and able to demonstrate these skills by coming to work on a regular basis. *Tyndall*, 31 F.3d at 213 n.1.'"

> *Id.*

17

*See also*, *Colon-Fontanez v. Municipality of San Juan*, 660 F.3d 17 (1st Cir. 2011) (where the court held that regardless of the plaintiff's skills or experience, her extensive absenteeism rendered her unqualified to perform her position's functions, particularly when the absenteeism persisted in spite of her employer's various accommodation efforts over the years).

Here, the Charging Party's excessive absenteeism, which was a pattern throughout much of her employment, worsened in 2009. In the first seven months of 2009 she was absent from work over 50% of the available full workdays and she missed some or all of 75% of the available workdays. The vast majority of absences were sporadic and unpredictable making it difficult for managers and coworkers to manage the workload. In fact, the calendar Gordon prepared reveals that there was only one week in the first seven months of 2009 during which she worked a full workweek. (Exh 1, Gordon Dec ¶10) Just as with the plaintiff in *Brenneman*, Charging Party's absenteeism placed a tremendous burden on her coworkers in that they were frequently and unpredictably called upon to perform her job as well as their own, and had to manage the erratic changes in their workload during an otherwise tumultuous economic environment. (Exh 8, Radl Dec ¶7) Charging Party's absenteeism also worsened despite the many accommodations provided by her management, which included, among other things, permitting her to far exceed her annual allotment of 80 hours of sick time and providing her with supervisor and coworker support and backup to cover her absences. Charging Party was not a qualified individual with a disability due to her excessive absenteeism. For this reason alone, Plaintiff's failure to accommodate claim should be dismissed.

**C.    Charging Party's Requested Accommodation Was Not Reasonable.**

Alternatively, Plaintiff's failure to accommodate claim should be dismissed because the only accommodation acceptable to Charging Party was not reasonable. Plaintiff's claim that

Ford denied Charging Party a reasonable accommodation centers around Ford's denial of her request to work from home "up to four days per week" whenever she determined that her IBS made it too difficult to "leave [her] home due to [her] disability."  (Exh 20, 4/22/09 email)

It is well-established that an employer is not required to provide an accommodation which removes an essential function of the job.  In addition to attendance, essential functions are the "fundamental job duties of the employment position the individual with a disability holds or desires."  29 C.F.R. §1630.2(n)(1).  "Evidence considered in determining whether a particular function is essential includes:  (1) the employer's judgment as to which functions are essential; (2) written job descriptions prepared before advertising or interviewing applicants for the job; (3) the amount of time spent on the job performing the function; (4) the consequences of not requiring the incumbent to perform the function; and (5) the work experience of past incumbents in the job."  *US Airways, Inc. v. Barnett*, 535 U.S. 391, 400 (2002).

In *Mason v. Avaya Communications Inc.*, 357 F.3d 1114, 1118 (10th Cir. 2000), the Tenth Circuit, in its review of that plaintiff's telecommuting request, recognized that "physical attendance in the workplace is itself an essential function of most jobs."  In that case, the plaintiff requested that she be permitted to perform her service coordinator position at home as an accommodation for her PTSD and maintained she could perform her job using a computer, telephone and fax machine.  Her employer rejected her request and argued that the plaintiff could not perform the essential functions from home because her position required supervision and teamwork.  The court noted that it does not sit as a "super personnel" department and that it was reluctant to permit employees to define the essential functions of their position based solely on their viewpoint and experience.  The court, noting uniform holdings that a requested at-home accommodation is unreasonable when the accommodation eliminates an essential function of the

19

job, upheld summary judgment. *See*, *e.g.*, *Hypes v. First Commerce Corp.*, 134 F.3d 721 (5th Cir. 1998) (holding that a "flex-time" accommodation was unreasonable because presence in the office was an essential function of the loan analyst's position); and *Smith v. Ameritech*, 19 F.3d 857, 867 (6th Cir. 1997) (holding that a disabled sales representative's request for an at-home accommodation was unreasonable under the ADA because the employee "failed to present any facts indicating that his was one of those exceptional cases where he could have 'performed at home without a substantial reduction in the quality of his performance.'").

Applying that same analysis here, Lisa King, Mike Kane, Dawn Gontko and John Gordon have all attested to the reactive and interactive nature of the resale buyer job.  Granted, it is a job where certain transactional tasks could be performed from a remote location, but the essence of the job requires teamwork, face-to-face interaction with a number of stakeholders both internal and external to Ford, and the flexibility to be available on any given workday to respond to emergencies and to interact with the team by attending group meetings at a Ford or external facility.  Charging Party's proposed "up to four days per week" unpredictable telecommuting arrangement would fundamentally alter the essence of the resale buyer job.

Charging Party maintains that, in her opinion, she could effectively perform the essential functions of the job from home.  Yet, in the judgment of her managers, an essential function is predictable and frequent presence in the workplace during business hours in order to both react to situations and engage in face-to-face interactions with others.  Courts do not "second guess" an employer's judgment as to which functions are essential if its description is "job-related, uniformly enforced and consistent with business necessity."  *Wells v. Shalala*, 228 F.3d 1137, 1144 (10th Cir. 2000).  Such is the case here.

In addition, Charging Party's management team was fully aware of the impact of her frequent absences on her ability to perform her job.  The impact was that her performance was not acceptable, she was dependent upon others to frequently assume her responsibilities, and she was not a fully functioning member of the resale team.

Plaintiff may argue that Charging Party should have been permitted her requested telecommuting arrangement because a handful of other buyers in the Body & Exterior area (none of whom were resale buyers) were permitted to telecommute.  These other telecommuting arrangements, however, were fundamentally different from what Charging Party was demanding.  The buyers at issue had different job duties.  Further, no buyer telecommuted "up to four days per week" (in fact most of the arrangements were for one day per week), and no buyer telecommuted without a predictable and agreed-upon schedule.  In addition, these telecommuters were expected to be in the workplace on their designated telecommute day if the business required their presence.  (Exh 21, Telecommuting Agreements; Exh 10, Telecommuting Policy)  Charging Party's telecommuting request was very different in that it centered around an unpredictable health condition which prevented her from being at work in any predictable way.

**D.    Plaintiff Cannot Present Any Evidence Of A Causal Connection Between Charging Party's Complaint That She Had Been Denied A Reasonable Accommodation And Her Termination.**

The ADA prohibits an employer from "discriminat[ing] against any individual because he or she has opposed any act or practice made unlawful by this chapter," or who has filed administrative proceedings to protest such an action as Charging Party did in this case.  42 U.S.C. §12203(a).  To establish a *prima facie* case of retaliation under the ADA, Plaintiff must establish (1) Charging Party engaged in protected activity; (2) that she suffered an adverse employment action; and (3) that a causal connection existed between the protected activity and

the adverse action. *Penny v. UPS*, 128 F.3d 408, 417 (6th Cir. 1997). Further, timing alone cannot establish causation. *Lindsey v. Whirlpool Corp.*, 295 Fed. Appx. 758, 770 (6th Cir. Oct. 2, 2008) (mere temporal proximity between an assertion of Title VII rights and an adverse action, without other indicia of retaliatory conduct, does not establish causation); *Tuttle v. Metropolitan Government of Nashville*, 474 F.3d 307, 321 (6th Cir. 2007) (similar); *Chandler v. Specialty Tires of America*, 283 F.3d 818, 826 (6th Cir. 2002).

Plaintiff contends that Charging Party's termination was in retaliation for having complained about the denial of her 2009 telecommuting request. Yet, there is no evidence suggesting a causal connection between the two events. It is undisputed that her EP3 rating in 2008 placed her in the bottom 10% of her peer group and that her 2007 and 2008 performance reviews depicted declining performance – and that all of this had occurred long before she made an ADA-related telecommuting request and filed her April 2009 EEOC charge. Moreover, Charging Party acknowledges that she has no basis for attributing any retaliatory motive to those involved in her termination decision – Lisa King, Mike Kane, Karen Jirik and Leslie Pray. (Exh 5, Harris dep at 245-253) And, even though she has a number of complaints about John Gordon (many of which preceded her EEOC charge), he was not a decision-maker relative to the termination decision, and when pressed to describe those complaints, she could not identify any competent evidence of a retaliatory animus. (Exh 5, Harris dep at 212-245) Because Plaintiff cannot proffer evidence of a causal connection between Charging Party's complaint and her termination, it cannot establish a *prima facie* case.

    **E.**    **Plaintiff Lacks Evidence That Ford's Articulated Non-Discriminatory Reason For Establishing The PEP And Terminating Charging Party Was Pretextual.**

Even if Plaintiff could establish the elements of a *prima facie* case of retaliation (which it cannot), it would still have to show that Ford's legitimate, non-discriminatory/non-retaliatory

reasons for its actions were pretextual. A plaintiff can show pretext in three interrelated ways: (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action. *Chen v. Dow Chemical Company*, 580 F.3d 394 (6th Cir. 2009). The Sixth Circuit in *Chen* cautioned that "formalism" in the application of this test should be avoided and that "at bottom the question is always whether the employer made up its stated reason to conceal intentional discrimination." *Id.*

The evidence overwhelmingly tells the story of an employee who failed to address her performance shortcomings despite many pointed criticisms – dating back to 2007 – in her performance reviews. Plaintiff also cannot dispute that Charging Party received EP3 contribution assessment ratings in 2007 and 2008, long before she complained about her telecommuting request being denied, and that the EP3 rating in 2008 placed her in the lowest 10% of her peers. Similarly, it cannot contest that Charging Party's complaints about Gordon long pre-date her April 2009 EEOC charge. Last, Charging Party cannot dispute that she had failed to meet her PEP objectives.

Plaintiff thus cannot establish that the true motivation for the performance criticisms and Charging Party's termination was anything other than her poor performance. In her deposition, Charging Party testified to a number of excuses and justifications for why she had not completed assignments and refused to accept that her failures in any way demonstrated poor performance. Even when she had no basis to dispute the accuracy of a performance metric (such as the number of her aged MSS's and MC's), she persistently refused to accept that this was an indicator of poor performance. (Exh 5, Harris dep at 442-445) The plaintiff in the *Chen* case similarly denied that her performance was poor even though the defendant had produced overwhelming

evidence to the contrary.  Despite the plaintiff's insistence that her performance was satisfactory, the Sixth Circuit affirmed summary judgment noting that "[w]hen an employer reasonably and honestly relies on particularized facts in making an employment decision, it is entitled to summary judgment on pretext even if its conclusion is later shown to be "mistaken, foolish, trivial, or baseless." *Id.*  In establishing pretext, a plaintiff then must establish more than a dispute over the facts.  *Braithwaite v. The Timken Co.*, 258 F.3d 488, 494 (6th Cir. 2001). Plaintiff must put forth evidence that Defendant did not "honestly believe" in the given reason for Plaintiff's termination.  There is no record evidence here that Lisa King – or anyone else in the management chain – was motivated by anything other than Charging Party's failure to perform against her PEP objectives when the decision was made to terminate her employment.

## IV.   CONCLUSION

For all of the foregoing reasons, Defendant Ford Motor Company respectfully requests that the Court grant summary judgment on all claims, and award Defendant such other relief as the Court sees fit.


KIENBAUM OPPERWALL
 HARDY & PELTON, P.L.C.

By:  s/*Jennifer A. Zinn*
     Elizabeth P. Hardy (P37426)
     William B. Forrest III (P60311)
     Jennifer A. Zinn (P41469)
Attorneys for Defendant
280 N. Old Woodward Avenue, Suite 400
Birmingham, MI  48009
(248) 645-0000
jzinn@kohp.com

Dated:  June 29, 2012

166998

24

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 29, 2012, I caused to be electronically filed the foregoing **Defendant Ford Motor Company's Motion for Summary Judgment** and **Brief in Support** with the Clerk of the Court using the ECF system, which will send notification of such filing to the following:

Nedra D. Campbell (P58768)          nedra.campbell@eeoc.gov

s/*Jennifer A. Zinn*
Kienbaum Opperwall Hardy & Pelton, P.L.C.
280 N. Old Woodward Avenue, Suite 400
Birmingham, MI  48009
(248) 645-0000
jzinn@kohp.com
(P41469)