UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION,

       Plaintiff,                             Case No. 11-13742

v.                                      Hon. John Corbett O'Meara

FORD MOTOR COMPANY,

       Defendant.
_____/

## OPINION AND ORDER GRANTING
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Before the court is Defendant Ford Motor Company's motion for summary judgment, filed June 29, 2012. Plaintiff Equal Employment Opportunity Commission filed a response on August 10, 2012; Defendant submitted a reply brief on August 24. Pursuant to L.R. 7.1(f)(2), the court did not hear oral argument.

## BACKGROUND FACTS

The Equal Employment Opportunity Commission ("EEOC") has brought this suit against Ford Motor Company ("Ford"), alleging that Ford failed to accommodate Jane Harris's disability and that Ford terminated her in retaliation for filing an EEOC charge. Harris worked for Ford from April 2003 to September 2009 as a resale buyer on the Raw Material team within the Body & Exterior Department of Vehicle Production Purchasing. Harris's group consisted of five to seven resale buyers. Her immediate supervisor was Dawn Gontko until 2006, when John Gordon became her supervisor. Other members of her management team were Mike Kane, Senior Purchasing Manager for Raw Material, and Lisa King, Director Global Commodity, Raw

Material and Stamping.

As a resale buyer, Harris purchased steel and resold it to Tier I stampers, who manufacture and supply vehicle parts to Ford's assembly plants. Harris was assigned specific stampers for whom she had the responsibility to source steel. After a resale buyer selects a steel source for a stamper, it is the resale buyer's job to ensure that there is no gap in the steel supply, respond to supply issues such as shortages or changes in specifications, and facilitate quality or pricing disputes between the stampers and steel sources. Def.'s Ex. 1 (Declaration of John Gordon at ¶¶ 3, 4).

Ford describes the resale buyer position as "highly interactive." Id. As Harris's supervisor stated in his declaration: "The resale buyer is the intermediary between two suppliers (the steel source and the stamper) and must ensure that the requirements are understood and translated correctly. The interaction between the buyer and the suppliers is most effectively performed face to face and often includes supplier site visits." Id. at ¶ 5. See also Def.'s Ex. 4 (Deposition of Lisa King at 43-44). Resale buyers are called upon to engage in problem-solving to avoid disruptions in the supply chain. As John Gordon described: "2008 and 2009 were particularly challenging years for the Raw Material team because a number of stampers went out of business or were absorbed by other stampers. The steel industry was also in turmoil. There was a global steel shortage in 2009 and a number of steel suppliers went under. These conditions created more emergency situations, in which the resale buyers, suppliers and internal Ford constituencies were required to come together on short notice for problem-solving dialogues." Def.'s Ex. 1 at ¶ 6.

Ford contends that Harris had chronic attendance issues as a resale buyer. After Harris

returned from a medical leave in February 2005, her supervisor attempted to accommodate her

continuing, frequent absences.  "Those adjustments included moving work from Ms. Harris'

desk to others, permitting her a later start time on Mondays, permitting her to work from home

on an ad hoc basis, reassigning time-sensitive assignments, and agreeing to permit her two

Alternative Work Schedule ('AWS')/telecommute periods.  AWS is a Ford program where

employees, with supervisor approval, are permitted to work four 10 hour days per week.  The

first trial AWS period occurred in September 2005 and the second occurred in November and

December 2005.  Neither of these trials was successful because Ms. Harris was unable to

establish regular and consistent work hours."  Def.'s Ex. 2 (Declaration of Dawn Gontko) at ¶ 3.

As a result, Gontko declined to approve a telecommuting arrangement for Harris.

John Gordon replaced Dawn Gontko as Harris's supervisor in 2006.  He testified that

throughout the time Harris reported to him, "she had chronic attendance issues." Def.'s Ex. 1 at ¶

8.  "I made a number of efforts to adjust to Ms. Harris' frequent absences by assuming her job

responsibilities or asking that her co-workers do so.  This was disruptive to their schedules and

mine.  Ms. Harris' attendance problems led to repeated requests to work from home, to begin her

workday at some time other than her agreed-upon start time, or to have time worked on the

weekends or after hours substitute for hours missed during Ford's core business hours." Id.

In addition to attendance problems, Harris began having difficulties with her work

performance in 2007.  That year, she received the second-lowest rating or lower in 7 of 11 skill

areas, and in 2008 she received the second-lowest rating or lower in 9 of 11 skill areas.  This was

a drop from her 2006 ratings.  See Def.'s Exs. 11, 12, 13.  In her 2007 review, Gordon and Mike

Kane noted that "Jane can be argumentative and does not respond to coaching from her

supervisor regarding disruptive behaviors.  Additionally, she has on a number of occasions, unnecessarily escalated relatively minor issues, disrupting her work as well as the work of her teammates.  These issues require excessive management involvement because Jane refuses to accept guidance." Def.'s Ex. 11.  She showed improvement in 2008, leading her supervisors to note that "Jane has taken to heart feedback received in prior reviews and applied herself to improve.  In 2008, she has shown a noticeable improvement in how she relates to her supervisor and coworkers as an example." Def.'s Ex. 12.  However, Harris's rating in 2008 placed her in the lowest 10% of her peers. Def.'s Ex. 14 at ¶ 4; Def.'s Ex. 1 at ¶ 13.

In February 2009, Harris requested that she be permitted to telecommute as an accommodation for her irritable bowel syndrome.  She made this request in an email to Leslie Pray in Human Resources, writing "[p]er my disability and Ford's telecommuting policy, I am asking Ford to accommodate my disability by allowing me to work up to four days per week from home." Def.'s Ex. 9.   On April 6, 2009, Pray, Gordon, and Karen Jirik of Personnel Relations met with Harris to discuss her accommodation request.  See Pl.'s Ex. I.  At the meeting, Gordon reviewed the responsibilities of the resale buyer position and discussed with Harris how and to what extent her tasks could be performed from home.  Id.; Def.'s Ex. 3 at ¶ 7.

After listening to the discussion and consulting with Gordon and Pray, Jirik decided to deny the telecommuting arrangement requested by Harris. Def.'s Ex. 3 at ¶ 8.  "I made this decision because Ms. Harris' job required regular interactions with her team and with a number of contacts both inside and outside of Ford, and these interactions could not be adequately handled over the phone or via email.  While occasional matters can be dealt with in that fashion, the spontaneous flow and exchange of information, which is critical to the group problem-

-4-

solving component of her job, would be compromised if issues had to be put on hold until a conference call could be scheduled.  I also based my decision on the fact that there were concerns with Ms. Harris' performance and because of the unpredictability of the schedule she was seeking.  It was my understanding that Ms. Harris would not be able to predict, based on her medical condition, what days she would be in the office." Id.

Jirik communicated this decision to Harris in a meeting on April 15, 2009, which Gordon also attended. Id. at ¶ 9; Pl.'s Ex. I.  At the meeting, Jirik suggested that, as an alternative, Harris's desk could be moved close to the restroom.  Jirik also offered Harris assistance in finding a different job within Ford that may be more amenable to a telecommuting arrangement. Harris rejected these suggestions "and offered no suggested accommodation other than the unpredictable 'up to four days per week' arrangement she described." Def.'s Ex. 3 at ¶ 9.

On April 22, 2009, Harris sent an email complaining that the denial of her telecommuting request was a violation of Ford's ADA policy.  She also complained that Gordon was treating her differently.  When Jirik requested a statement from Harris detailing the basis for her complaint, Harris declined to provide one, stating that she was "too busy." Id. at ¶ 10.  On April 23, 2009, Harris filed an EEOC charge against Ford, contending that the company denied her a reasonable accommodation for her disability.

Ford contends that Harris's performance worsened during 2009.  Specifically, on her 2009 interim review, prepared in July, it was noted that Harris failed to keep current with the processing of purchase orders ("MSSs") and material claims ("MCs").  MCs are communications from either the steel source or stamper describing a dispute between them.  The buyer's responsibility is to act as a facilitator and resolve those claims.

In April 2009, Harris knowingly processed a number of MSSs with incorrect pricing over a weekend, when correct pricing was unavailable from the supplier.  She did not correct the errors, even when the steel source (Taylor Steel) sent her an email with the correct pricing information and requested the correction.  Def's Ex. 5 at 441-42; Ex. 1 at ¶ 16; Ex. 16 (email from Taylor Steel).  Gordon learned of the error weeks later when Taylor Steel contacted him directly requesting that the error be corrected, which one of Harris's coworkers did. Def.'s Ex. 1 at ¶ 16.  See also Def.'s Ex. 1 at ¶ 18 (noting that Harris failed to keep a buyer responsibility spreadsheet up to date).

Gordon noted in Harris's interim review that she had "difficulty working with others." For example, Harris's team met on May 5, 2009, to address workload issues, specifically that Harris's frequent absences put a burden on her backup "buddy" and how the situation could be resolved.  See Def.'s Ex. 8 at ¶ 7 ("Ms. Harris' sporadic absences created a great deal of stress for me because I was assigned in the 2008/2009 time frame to be her "buddy" or primary backup for such absences. . . .  Ms. Harris' untimeliness caused supplier frustration, which only compounded the problems I had covering for her during her absences.").  Gordon stated that "[r]ather than participate in the discussion as to what reallocation made the best business sense, Ms. Harris immediately became confrontational with me and her co-workers then abruptly left the meeting.  She was observed hysterically screaming and crying in the women's restroom." Def.'s Ex. 1 at ¶ 19.  See also Def's Ex. 7 at ¶ 7; Def's Ex. 8 at ¶ 8.

Harris was rated "lower achiever" on her 2009 interim review.  Gordon noted that she "has demonstrated ineffective interpersonal skills, lack of concern for quality, difficulty delivering results, and poor attendance and attendance reporting." Def's Ex. 15.  Harris contends

that the low review, which put her in the bottom 10% of her peers, was done in retaliation for her filing an EEOC charge. Harris does not specifically dispute, however, her failure to keep current with MSSs and MCs, her pricing errors on the Taylor Steel MSSs, or her difficulty in working with others, among the other examples provided in the review. See id.

As a result of the poor interim review, Harris was placed on a performance improvement plan ("PEP") for thirty days. See Def.'s Ex. 17. Harris was informed that unless her supervisors saw "significant improvement" in her performance, she could be terminated. Def.'s Ex. 15. Gordon and Kane worked with Kane's manager, Lisa King, to develop the PEP, with the goal of providing Harris "with very achievable and fundamental assignments with clear deadlines to assist Ms. Harris in improving her performance." Def.'s Ex. 1 at ¶ 20. See also Def.'s Ex. 14 at ¶ 6.

For example, the first objective of the PEP was for Harris to better manage her "work queue" by ensuring that all MCs were resolved within 90 days and all MSSs were processed within 120 days. At the beginning of the PEP period, Harris had 14 MCs older than 90 days; by the end, that number had grown to 18. She had 19 MSSs that were older than 120 days at the beginning of the PEP period; at the end she had reduced that number to 17. Gordon and Kane determined that Harris did not meet this objective, and failed to meet many of the objectives of the PEP. Kane noted that Harris "failed to meet many of the PEP objectives, was late with respect to others, and did not respond to the PEP with the urgency I anticipated." Def.'s Ex. 14 at ¶ 7.

After the thirty-day PEP period, Kane met with King to discuss Harris's progress. At that time, King made the decision to terminate Harris. Id. at ¶ 8. Gordon was on vacation and

-7-

did not participate in the decision.  Harris was terminated effective September 10, 2009.  On

September 22, 2009, she filed another EEOC charge, contending that her poor performance

review, PEP, and termination were done in retaliation for filing the initial charge.  The EEOC

brought this action, alleging a failure to accommodate and retaliation under the Americans with

Disabilities Act, on August 26, 2011.

## LAW AND ANALYSIS

### I.      Summary Judgment Standard

Ford seeks summary judgment on the EEOC's accommodation and retaliation claims.

Summary judgment is appropriate if "there is no genuine issue as to any material fact and . . . the

moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  When

reviewing a motion for summary judgment, the facts and any reasonable inferences drawn from

the facts must be viewed in the light most favorable to the nonmoving party. Matsushita Elec.

Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  The party opposing summary

judgment, however, must present more than a "mere scintilla" of evidence; the evidence must be

such that a reasonable jury could find in favor of the plaintiff. Anderson v. Liberty Lobby, Inc.,

477 U.S. 242, 252 (1986).

### II.     Failure to Accommodate

In order to establish a prima facie case for failure to accommodate under the ADA, a

plaintiff must show that: (1) the individual is disabled within the meaning of the Act; (2) she is

otherwise qualified for the position, with or without reasonable accommodation; (3) her

employer knew or had reason to know about her disability; (4) she requested an accommodation;

and (5) the employer failed to provide the necessary accommodation.  DiCarlo v. Potter, 358

F.3d 408, 419 (6th Cir. 2004) (analyzing claim under Rehabilitation Act); Johnson v. Cleveland

City Sch. Dist., 443 Fed. Appx. 974, 982-83 (6th Cir. 2011) (citing DiCarlo for elements of prima

facie ADA case).

Ford contends that Harris is not otherwise "qualified" for the resale buyer position,

because of her excessive absenteeism, and that her proposed accommodation was not reasonable.

Ford notes that Harris was absent 50% of full workdays in 2009, and her partial absences

increased her "absence days" to 75% of available workdays.  The EEOC essentially argues that

Harris should not be penalized for her excessive absenteeism, which grew worse after Ford

denied her the ability to telecommute.  In other words, the EEOC suggests that if Harris were

permitted to telecommute, she would not have incurred so many absences.  The EEOC also

contends that on some of the days Harris was allegedly absent, she "was on approved medical

leave, performed work from home, or performed work from home while taking intermittent

FMLA leave." Pl.'s Br. at 8.  See also Pl.'s Ex. F (EEOC's attendance analysis); Def.'s Ex. 1 at

6-8 (Ford's attendance analysis).  In any event, it is clear from the record that Harris was absent

more often than she was at work.

On this basis alone, Harris is not a "qualified" individual under the ADA.  See

Brenneman v. MedCentral Health Sys., 366 F.3d 412 (6th Cir. 2004) (holding the plaintiff

pharmacy technician was unqualified for the position because of his excessive absenteeism);

Tyndall v. National Educ. Ctrs. Inc., 31 F.3d 209, 213 (4th Cir. 1994) ("An employee who cannot

meet the attendance requirements of the job at issue cannot be considered a 'qualified' individual

protected by the ADA."); Waggoner v. Olin Corp., 169 F.3d 481, 485 (7th Cir. 1999) (employer

not obligated to "tolerate erratic, unreliable attendance").  Indeed, regular attendance is a basic

requirement of most jobs.

The EEOC argues, however, that Harris could have performed her job duties from home and that, therefore, regular attendance was not an essential function of the resale buyer position. Although the evidence suggests that some of Harris's job duties could have been performed at home, her managers did not agree that she could successfully perform her essential job functions at home on a regular basis "up to four days" per week.  Courts have declined to second-guess an employer's business judgment regarding the essential functions of a job:

> The ADA requires us to consider "the employer's judgment as to what functions of a job are essential[.]" 42 U.S.C. § 12111(8). The employer describes the job and functions required to perform that job.  We will not second guess the employer's judgment when its description is job-related, uniformly enforced, and consistent with business necessity.  In short, the essential function "inquiry is not intended to second guess the employer or to require the employer to lower company standards."

 Mason v. Avaya Communications, Inc., 357 F.3d 1114, 1119 (10th Cir. 2004) (citations omitted).        Here, the evidence suggests that the essential functions of Harris's job could not be performed at home "up to four days per week."  Her frequent, unpredictable absences negatively affected her performance and increased the workload of her colleagues.  Harris states that she could perform her job duties via computer and conference call; again, however, her managers did not agree.  See Mason, 357 F.3d at 1122 ("We are reluctant to allow employees to define the essential functions of their positions based solely on their personal viewpoint and experience.").

Although a few other buyers were permitted to telecommute, they did so once a week, on a regularly scheduled day.  No other buyer was permitted to telecommute "up to four days per week," whenever she determined she was unable to come in to the office.

-10-

Moreover, in general courts have found that working at home is rarely a reasonable accommodation.  See Vande Zande v. Wisconsin Dept. of Admin., 44 F.3d 538, 544-45 (1995) ("No doubt to this as to any generalization about so complex and varied an activity as employment there are exceptions, but it would take a very extraordinary case for the employee to be able to create a triable issue of the employer's failure to allow the employee to work at home."); Smith v. Ameritech, 129 F.3d 857, 867 (6th Cir. 1997) ("Plaintiff has failed to present any facts indicating that his was one of those exceptional cases where he could have 'performed at home without a substantial reduction in quality of [his] performance.'") (citing Vande Zande, 44 F.3d at 544); Rauen v. United States Tobacco Mfg. L. P., 319 F.3d 891 (7th Cir. 2003) ("The reason working at home is rarely a reasonable accommodation is because most jobs require the kind of teamwork, personal interaction, and supervision that simply cannot be had in a home office situation.").

Plaintiff relies upon Humphrey v. Memorial Hosp. Ass'n, 239 F.3d 1128 (9th Cir. 2001) to support its argument that working at home was a reasonable accommodation for Harris. However, the plaintiff in Humphrey was a medical transcriptionist, whose position could be performed entirely on a computer and did not require interaction with others.  The medical transcriptionist position belongs to that "exceptional" class of jobs that could potentially be "performed at home without a substantial reduction in the quality of . . . performance."  See Vande Zande, 44 F.3d at 544.

This case is closer to Rauen, where the plaintiff's "primary job responsibilities involve monitoring contractors' work, answering contractors' questions as they arise, and ensuring that the contractors' work does not interfere with the manufacturing process. . . .  Further, in the type

-11-

of project and production work that Rauen's job involves, problems requiring immediate resolution would undoubtedly arise on the spur of the moment. . . . hers is the kind of job that requires teamwork, interaction, and coordination of the type that requires being in the work place.  Thus, her situation does not present the exceptional case where a work-at-home accommodation would be reasonable."  <u>Rauen</u>, 319 F.3d at 897.  The record, including testimony from other resale buyers, reflects that Harris's position often required spur-of-the-moment, group problem-solving with members of the resale team and suppliers, which is most effectively handled in person.  Def.'s Ex. 1 at ¶ 11; Ex. 2 at ¶ 4; Ex. 4 at 43; Ex. 7 at ¶ 8; Ex. 8 at ¶¶ 4, 5; Ex. 14 at ¶ 10.  Harris's opinion to the contrary is not sufficient to overcome Ford's reasoned business judgment that the resale buyer position does not lend itself to frequent, unpredictable workdays out of the office.

Accordingly, the court finds that Harris's proposed accommodation of working from home up to four days per week is not reasonable.  The court will grant summary judgment in favor of Ford on this claim.

**III.   <u>Retaliation</u>**

The EEOC also contends that Harris was retaliated against for filing an EEOC charge.  In order to establish a prima facie case of retaliation under the ADA, Plaintiff must demonstrate (1) Harris engaged in protected activity; (2) she suffered an adverse employment action; and (3) a causal connection exists between the protected activity and the adverse action.  <u>Penny v. UPS</u>, 128 F.3d 408, 417 (6th Cir. 1997) (noting that retaliation claims are treated the same under the ADA and Title VII).  If the plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate a legitimate non-retaliatory reason for its actions. <u>Id.</u>  The plaintiff has the

ultimate burden of demonstrating that the defendant's reason is pretextual.  Id.  A plaintiff can demonstrate pretext by showing that (1) the articulated reason has no basis in fact; (2) the reason did not actually motivate the employer's action; or (3) the reason was insufficient to motivate the employer's action.  Chen v. Dow Chem. Co., 580 F.3d 394, 400 (6th Cir. 2009).

Harris filed her initial EEOC charge on April 23, 2009.  She received a low performance review in July 2009.  The poor review prompted her management team to place her on a performance improvement plan ("PEP").  After Harris failed to meet the objectives of the PEP, Ford terminated her employment.

The EEOC contends that her low performance review and the PEP, which referenced her attendance issues, were retaliatory.  The EEOC argues that the timing of Harris's poor review, PEP, and termination, just months after she filed her charge, establishes a causal link between the protected activity and termination.  The EEOC also cites Ford's failure to investigate Harris's complaints of retaliatory harassment as a causal link.

The record reflects, however, that Harris's low performance review and PEP were not based solely on her attendance issues.  The EEOC fails to dispute the specific performance deficiencies documented by Ford in the interim review.  Nor does the EEOC dispute that Harris failed to meet the performance objectives required by the PEP.  Although the timing of these reviews could be sufficient to establish the causal link required to set forth a prima facie case, the EEOC cannot further establish that Ford's reasons for terminating Harris were pretextual.  Ford's alleged failure to investigate Harris's complaint also does not suggest a retaliatory motive; the undisputed evidence is that Harris refused to provide the information necessary for Ford to conduct an investigation.  See Def.'s Ex. A at 111-12.  In sum, the evidence does not cast doubt

-13-

on Ford's stated reason for terminating Harris's employment: poor performance.

## **<u>ORDER</u>**

Therefore, IT IS HEREBY ORDERED that Defendant's June 29, 2012 motion for

summary judgment is GRANTED.  Judgment will be entered in favor of Defendant.



<u>s/John Corbett O'Meara </u>
United States District Judge


Date:  September 10, 2012




I hereby certify that a copy of the foregoing document was served upon counsel of record
on this date, September 10, 2012, using the ECF system.


<u>s/William Barkholz </u>
Case Manager

-14-