# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

100 EAST FIFTH STREET, ROOM 540
POTTER STEWART U.S. COURTHOUSE
CINCINNATI, OHIO 45202-3988

Deborah S. Hunt
Clerk

Tel. (513) 564-7000
www.ca6.uscourts.gov

Filed:  April 22, 2014

Ms. Gail S. Coleman
U.S. Equal Employment Opportunity Commission
Office of General Counsel
131 M Street, N.E., 5SW24L
Washington, DC 20507

Ms. Julia Turner Baumhart
Mr. William Bruce Forrest III
Ms. Elizabeth Phelps Hardy
Kienbaum, Opperwall, Hardy & Pelton
280 N. Old Woodward Avenue, Suite 400
Birmingham, MI 48009

Ms. Ann Elizabeth Reesman
Norris, Tysse, Lampley & Lakis
1501 M Street, N.W., Suite 400
Washington, DC 20005

Mr. Eugene Scalia
Gibson, Dunn & Crutcher
1050 Connecticut Avenue, N.W.
Washington, DC 20036

Re:  Case No. 12-2484, *EEOC v. Ford Motor Company*
     Originating Case No. : 5:11-cv-13742

Dear Counsel,

   The court today announced its decision in the above-styled case.

   Enclosed is a copy of the court's opinion together with the judgment which has been entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

Yours very truly,

Deborah S. Hunt, Clerk

Cathryn Lovely
Deputy Clerk

cc:  Mr. David J. Weaver

Enclosures

Mandate to issue.

*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 14a0082p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

_____

EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION,

*Plaintiff-Appellant,*

No. 12-2484

*v.*

FORD MOTOR COMPANY,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Eastern District of Michigan at Ann Arbor.
No. 5:11-cv-13742—John Corbett O'Meara, District Judge.

Argued: October 10, 2013

Decided and Filed: April 22, 2014

Before: MOORE and McKEAGUE, Circuit Judges; HELMICK, District Judge.[*]

_____

**COUNSEL**

**ARGUED:** Gail S. Coleman, EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION, Washington, D.C., for Appellant. Eugene Scalia, GIBSON, DUNN &
CRUTCHER LLP, Washington, D.C., for Appellee. **ON BRIEF:** Gail S. Coleman,
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Washington, D.C., for
Appellant. Eugene Scalia, Porter Wilkinson, GIBSON, DUNN & CRUTCHER LLP,
Washington, D.C., Elizabeth P. Hardy, KIENBAUM OPPERWALL HARDY &
PELTON, P.L.C., Birmingham, Michigan, for Appellee.

MOORE, J., delivered the opinion of the court, in which HELMICK, D.J., joined.
McKEAGUE, J. (pp. 23–32), delivered a separate dissenting opinion.

_____

[*] The Honorable Jeffrey J. Helmick, United States District Judge for the Northern District of Ohio,
sitting by designation.

1

---

## OPINION

---

KAREN NELSON MOORE, Circuit Judge.  At issue in this case is whether a telecommuting arrangement could be a reasonable accommodation for an employee suffering from a debilitating disability.  Charging party Jane Harris was terminated from her position as a resale steel buyer at Ford Motor Co. ("Ford") after she asked to telecommute several days per week in an attempt to control the symptoms of irritable bowel syndrome ("IBS").  The Equal Employment Opportunity Commission ("EEOC") argues that Ford discriminated against Harris on the basis of her disability and retaliated against her for filing a charge with the EEOC.  The district court granted summary judgment in favor of Ford.  Because we find evidence in the record to create a genuine dispute as to whether Harris was qualified to work as a resale buyer and whether she was terminated in retaliation for filing an EEOC charge, we **REVERSE** the district court's grant of summary judgment and **REMAND** for proceedings consistent with this opinion.

## I.  BACKGROUND

In 2003, Jane Harris was hired as a resale buyer at Ford.  Resale steel buyers serve as intermediaries between steel suppliers and "stampers," the companies that use steel to produce parts for Ford.  R. 60-2 (Gordon Decl. ¶ 3) (Page ID #1027).  Their role is to respond to emergency supply issues to ensure that there is no gap in steel supply to the parts manufacturers.  *Id.* ¶ 3–4 (Page ID #1027–28).  The position involved some individual tasks, such as updating spreadsheets and periodic site visits to observe the production process.  R. 60-5 (King Dep. at 46) (Page ID #1057).  However, "the essence of the job was group problem-solving, which required that a buyer be available to interact with members of the resale team, suppliers and others in the Ford system when problems arose."  R. 60-2 (Gordon Decl. ¶ 11) (Page ID #1034).  Ford managers made the business judgment that such meetings were most effectively handled face-to-face, and that email or teleconferencing was an insufficient substitute for in-person team problem-solving.  *Id.*; R. 60-4 (Jirik Decl. ¶ 8) (Page ID #1048–49); R. 60-3 (Gontko

Decl. ¶ 4) (Page ID #1043).  Another resale buyer on Harris's team believed that she "could not work from home more than one day a week and be able to effectively perform the duties of the resale buyer position."  R. 60-8 (Pompey Decl. ¶ 11) (Page ID #1095). Harris worked in this role until September 2009, when she was terminated.  R. 60-2 (Gordon Decl. ¶ 26) (Page ID #1040–41).

Harris was a consistently competent, though not perfect, employee.  In her annual performance reviews between 2004 and 2008, Harris was rated as "excellent plus."  R. 66-2 (2004 Perf. Rev.) (Page ID #1260); R. 60-14 (2006 Perf. Rev.) (Page ID #1135); R. 60-12 (2007 Perf. Rev.) (Page ID #1122); R. 60-13 (2008 Perf. Rev.) (Page ID #1129).  Her reviews included notations that she worked diligently with "minimal supervision" and possessed strong knowledge of the steel market.  R. 60-14 (2006 Perf. Rev.) (Page ID #1135); R. 60-12 (2007 Perf. Rev.) (Page ID #1122).  However, Harris's supervisors also critiqued her interpersonal skills, noting that she could be disruptive and argumentative.  R. 60-12 (2007 Perf. Rev.) (Page ID #1122).  Because 80% of buyers received the "excellent plus" rating, managers also assigned each employee a "contribution assessment," but did not share this additional assessment with the employees.  R. 60-2 (Gordon Decl. ¶ 13) (Page ID #1034–35).  In 2007 and 2008 Harris received the lowest contribution assessment level, placing her in the bottom quartile of employees in her peer group.  *Id.*  She also received low rankings on most of her job-related skills assessment areas in 2007 and 2008.  R. 60-4 (Jirik Decl. ¶ 16) (Page ID #1052–53).

Throughout her entire period of employment with Ford, Harris suffered from IBS, an illness that causes fecal incontinence.  R. 67-3 (Harris Dep. at 139–40) (Page ID #1384).  Over time, her symptoms worsened and, on particularly bad days, Harris would be unable even to drive to work or stand up from her desk without soiling herself.  *Id.* at 140 (Page ID #1384); R. 60-6 (Harris Dep. at 144) (Page ID #1060).  Harris began to take intermittent FMLA leave when she experienced severe IBS symptoms.  R. 66-3 (Harris Decl. ¶ 12) (Page ID #1264).

After she began taking leave, Harris's absences started to affect her job performance. In 2005, Dawn Gontko, Harris's supervisor at that time, responded to Harris's attendance problems by allowing her to work on a flex-time telecommuting schedule on a trial basis. Gontko deemed the trial unsuccessful because Harris "was unable to establish regular and consistent work hours." R. 60-3 (Gontko Decl. ¶ 3) (Page ID #1043). When Harris's absences continued, Gontko placed her on Workplace Guidelines, a tool used by supervisors to assist employees in improving attendance. *Id.* ¶ 5 (Page ID #1043–44). Jim Gordon, Gontko's successor, also found Harris's absences to be problematic. Although Ford did not approve remote work, Harris worked from home on an informal basis, including on evenings and weekends, to keep up with her work. However, Ford did not credit Harris with the time she spent working during non-"core" hours and marked the days that she stayed home because of her illness as absences. R. 60-2 (Gordon Decl. ¶ 8–9) (Page ID #1029–30). Ford took the position that "if [Harris] was too ill to come to work, she would be considered too ill to work." *Id.* ¶ 8 (Page ID #1029–30). Time spent working after core business hours was considered "casual overtime" expected of salaried employees. R. 60-6 (Harris Dep. at 237–38) (Page ID #1071).

Ford also explained that work performed outside of core business hours is not a sufficient substitute for work during regular hours because employees cannot engage in team problem-solving or access suppliers to obtain information during off-hours. R. 60-2 (Gordon Decl. ¶ 7) (Page ID #1029). Indeed, when Harris worked nights and weekends, she made mistakes and missed deadlines because she lacked access to suppliers. For example, while working on Saturday, April 18, 2009, Harris submitted a purchase order containing incorrect pricing information because she could not immediately access the supplier on a weekend to obtain updated quotations. R. 60-2 (Gordon Decl. ¶ 16) (Page ID #1036–37). These mistakes added to the frustration of both suppliers and coworkers, who had to take time to correct them. Because Harris was not permitted to work remotely to mitigate the effect of her many unscheduled "absences," Gordon was forced to shift some of her work to himself or Harris's teammates. *Id.* ¶ 8 (Page ID #1029–30); R. 60-8 (Pompey Decl. ¶ 4, 6) (Page ID

#1092–93). Under Ford's system of marking absences, in the first seven months of 2009 Harris was absent more often than she was present during core business hours. R. 60-2 (Gordon Decl. ¶ 10) (Page ID #1030–33).

In February 2009, Harris formally requested that she be permitted to telecommute on an as-needed basis as an accommodation for her disability. R. 60-10 (Pray Email) (Page ID #1100). Ford utilized a telecommuting policy that authorized employees to work up to four days per week from a telecommuting site. R. 60-11 (Telecommuting Policy) (Page ID #1103). The policy provides that all salaried employees are eligible to apply for a telecommuting arrangement, but specifically states that such arrangements are not appropriate for "all jobs, employees, work environments or even managers." *Id.* (Page ID #1104). Under this policy, several other buyers telecommuted on one scheduled day per week. R. 66-21 (Coworkers' Telework Agreements) (Page ID #1362–63).

Harris believed that being permitted to work from home would relieve her stress and alleviate her IBS symptoms, and that any episodes would be less disruptive at home because they would not affect her coworkers. R. 60-6 (Harris Dep. at 146–48) (Page ID #1061). In a meeting between Harris, Gordon, and human resources to discuss her telecommuting request, Harris maintained that most of her work could be done via computer or telephone. R. 66-10 (Meeting Notes) (Page ID #1319–20). When Gordon raised a concern about Harris meeting with suppliers, she responded that she could reschedule meetings that fell at inconvenient times. *Id.* After this meeting, Harris's supervisors discussed her job requirements and concluded that her position was not suitable to telecommuting. R. 60-2 (Gordon Decl. ¶ 11) (Page ID #1034). Ford denied the request.

Instead, Karen Jirik, a Ford personnel relations representative, suggested several alternative accommodations, including moving Harris's cubicle closer to the restroom or seeking another job within Ford more suitable for telecommuting. R. 60-4 (Jirik Decl. ¶ 9) (Page ID #1049). Harris rejected each of these options. She also complained that Gordon had begun harassing her because of her leave-related absences. *Id.* ¶ 10. Jirik

asked Harris to write a statement providing details regarding her complaint, but Harris never submitted a statement and Ford did not conduct an investigation. *Id.*

On April 23, 2009, Harris filed a charge of discrimination with the EEOC. R. 66-12 (EEOC Charge) (Page ID #1330). A few weeks later, Gordon held a team meeting to discuss how best to allocate Harris's workload when she had to be absent, but Harris became emotional and fled the room. R. 60-2 (Gordon Decl. ¶ 19) (Page ID #1038). In July 2009, Gordon placed Harris on Workplace Guidelines. R. 60-4 (Jirik Decl. ¶ 3) (Page ID #1046–47). Gordon also initiated a series of weekly meetings with Harris to discuss her performance. Harris felt threatened during these meetings because they were one-on-one, closed door sessions, during which Gordon used "military style yelling" and refused to allow her to leave the room. R. 60-6 (Harris Dep. at 218–19) (Page ID #1066). In late July, Harris's interim performance review categorized her as a "lower achiever"[1] and Gordon placed her on a Performance Enhancement Plan ("PEP"). R. 60-16 (2009 Interim Perf. Rev.) (Page ID #1141–42). The PEP was a tool designed to help employees improve performance by establishing concrete objectives that they could easily achieve within thirty days. R. 60-2 (Gordon Decl. ¶ 20) (Page ID #1039). At the conclusion of the 30-day PEP period, Ford determined that Harris had failed to meet any of the identified objectives. *Id.* ¶¶ 22–25 (Page ID #1039–40). A supervisory team held a meeting and decided to terminate her employment. *Id.* ¶ 26 (Page ID #1040–41).

In 2011, the EEOC filed a complaint in the United States District Court for the Eastern District of Michigan, alleging that Ford violated the ADA by failing to accommodate Harris's disability, 42 U.S.C. § 12112, and by retaliating against her for filing a charge with the EEOC, 42 U.S.C. § 12203. R. 9 (Am. Compl.) (Page ID #24–28). Ford moved for summary judgment on both claims, R. 60 (Def. Mot. for Summ. J.) (Page ID #991–1023), and the district court granted summary judgment in favor of Ford. R. 68 (D. Ct. Op.) (Page ID #1390–1403).

---

[1]In 2009 Ford changed its performance rankings, jettisoning the "excellent plus" rating and using a new rubric ranging from "Top Achiever" to "Unsatisfactory." The "Lower Achiever" ranking falls just above "Unsatisfactory." Harris noted on the bottom of the review: "This review represents retaliatory harassment behavior on the part of my supervisor, John Gordon, due to my filing a charge of Disability Discrimination with the EEOC." R. 60-16 (2009 Interim Perf. Rev.) (Page ID #1140).

The district court reasoned that the EEOC could not prevail on the failure-to-accommodate claim because Harris was not a "qualified" individual on the basis of her excessive absenteeism.  *Id.* at 9–10 (Page ID #1398–99).  Furthermore, relying on precedent "declin[ing] to second-guess an employer's business judgment regarding the essential functions of a job," the district court found that Harris's request to telecommute up to four days per week was not a reasonable accommodation for her position.  *Id.* at 10 (Page ID #1399).  The district court additionally reasoned that the EEOC could not establish that Harris's low performance reviews, placement on a PEP, and termination were retaliatory because those decisions were also based on performance deficiencies unrelated to the attendance issues arising from her IBS.  *Id.* at 12–13 (Page ID #1401–02).  This timely appeal followed.

## II.  STANDARD OF REVIEW

We review de novo an order granting summary judgment.  *DiCarlo v. Potter*, 358 F.3d 408, 414 (6th Cir. 2004).  A grant of summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In determining whether the district court's grant of summary judgment was proper, "we must view all evidence in the light most favorable to the nonmoving party."  *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 868 (6th Cir. 2007) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

## III.  FAILURE-TO-ACCOMMODATE CLAIM

The EEOC argues that Ford violated the ADA by refusing to provide a reasonable accommodation for Harris's disability.  Under the ADA, an employer may not "discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  An employer "discriminates" under the ADA if it does not make "reasonable accommodations to the known physical or mental limitations of an

otherwise qualified individual with a disability who is an applicant or an employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business." *Id.* at § 12112(b)(5).

When a plaintiff premises a discrimination claim upon an employer's failure to accommodate her disability, we analyze her claim under the following framework:

> (1) The plaintiff bears the burden of establishing that he or she is disabled.  (2) The plaintiff bears the burden of establishing that he or she is "otherwise qualified" for the position despite his or her disability: (a) without accommodation from the employer; (b) with an alleged "essential" job requirement eliminated; or (c) with a proposed reasonable accommodation.  (3) The employer will bear the burden of proving that a challenged job criterion is essential, and therefore a business necessity, or that a proposed accommodation will impose an undue hardship upon the employer.

*Kleiber*, 485 F.3d at 869 (quoting *Hedrick v. Western Reserve Care Sys.*, 355 F.3d 444, 452 (6th Cir. 2004)); *see also Hoskins v. Oakland Cnty. Sheriff's Dep't*, 227 F.3d 719, 724 (6th Cir. 2000); *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1182–83 (6th Cir. 1996), *abrogated on other grounds by Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312 (6th Cir. 2012) (en banc).

Harris is indisputably disabled under the ADA:  Her IBS is a physical impairment that substantially limits the operation of her bowel, a major bodily function.  *See* 42 U.S.C. § 12102(1)(A), 12102(2)(B).  The dispute in this case centers upon whether Harris was "otherwise qualified" for the resale steel buyer position.  Harris has presented evidence to establish that she was qualified on two alternative bases:  (a) she was qualified for the position after the elimination of the requirement that she be physically present at Ford facilities or (b) she was qualified for the position with a telecommuting accommodation.  Because Harris has provided sufficient evidence to create a genuine dispute of material fact as to her qualification for the resale buyer position, the burden shifts to Ford to prove that either (a) the physical-presence requirement is an essential function of Harris's job or (b) the telecommuting arrangement would create an undue hardship.

## A.  Qualification with "Essential" Job Requirement Eliminated

The EEOC offered evidence to demonstrate that, if the physical-presence requirement is eliminated, Harris is qualified for the resale-buyer position.  Harris earned consistently positive performance reviews in the years leading up to her termination.  R. 66-2 (2004 Perf. Rev.) (Page ID #1260); R. 60-14 (2006 Perf. Rev.) (Page ID #1135); R. 60-12 (2007 Perf. Rev.) (Page ID #1122); R. 60-13 (2008 Perf. Rev.) (Page ID #1129).  Although she sometimes struggled with interpersonal relations, Harris's supervisors praised her for her knowledge of the steel industry and her ability to work diligently without close supervision.  R. 60-14 (2006 Perf. Rev.) (Page ID #1135); R. 60-12 (2007 Perf. Rev.) (Page ID #1122).  Ford's only serious criticism of Harris's job performance related to her frequent absences during severe IBS flare-ups.  R. 60-2 (Gordon Decl. ¶¶ 8–10) (Page ID #1029–33).  Thus, leaving attendance issues aside, no record evidence indicates that Harris lacked the qualifications necessary to fulfill her role as a resale steel buyer.

Because the EEOC can demonstrate that Harris was qualified for her position if physical attendance at the worksite is not considered, the burden shifts to Ford to prove that physical presence in the workplace is an "essential function" of the resale buyer position.  Ford cannot indisputably carry its burden.  For many positions, regular attendance at the work place is undoubtedly essential.  *See Brenneman v. MedCentral Health Sys.*, 366 F.3d 412, 418 (6th Cir. 2004); *Gantt v. Wilson Sporting Goods Co.*, 143 F.3d 1042, 1047 (6th Cir. 1998).  Indeed, the dissent cites a litany of cases that extol the sanctity of the attendance requirement.  *See, e.g.*, *Samper v. Providence St. Vincent Med. Ctr.*, 675 F.3d 1233,1235 (9th Cir. 2012); *Colón-Fontánez v. Municipality of San Juan*, 660 F.3d 17, 33 (1st Cir. 2011); *Brenneman*, 366 F.3d at 419; *Gantt*, 143 F.3d at 1047 ("An employee who cannot meet the attendance requirements of the job at issue cannot be considered a qualified individual protected by the ADA.").  What the dissent fails to recognize is that these cases focus on "predictable" and "regular" attendance in the workplace as an essential requirement of most jobs.  The assumption implicit in the dissent's analysis and many of the early cases is that the "workplace" is the physical

worksite provided by the employer.  When we first developed the principle that attendance is an essential requirement of most jobs, technology was such that the workplace and an employer's brick-and-mortar location were synonymous.  However, as technology has advanced in the intervening decades, and an ever-greater number of employers and employees utilize remote work arrangements, attendance at the workplace can no longer be assumed to mean attendance at the employer's physical location.  Instead, the law must respond to the advance of technology in the employment context, as it has in other areas of modern life,[2] and recognize that the "workplace" is anywhere that an employee can perform her job duties.  Thus, the vital question in this case is not whether "attendance" was an essential job function for a resale buyer, but whether physical presence at the Ford facilities was truly essential.  Determining whether physical presence is essential to a particular job is a "highly fact specific" question. *Hoskins*, 227 F.3d at 726.  Accordingly, we consider several factors to guide our inquiry, including written job descriptions, the business judgment of the employer, the amount of time spent performing the function, and the work experience of past and present employees in the same or similar positions.  *See* 29 C.F.R. § 1630.2(n)(2).

Ford argues that physical attendance at the Ford workplace was critical to the group dynamic of the resale-buyer team.  Our sister circuits have recognized that physical presence at an employer's facility may be an essential function for some positions specifically because they require extensive teamwork.  *See Samper*, 675 F.3d at 1237 ("Sometimes [attendance] is required simply because the employee must work as 'part of a team.'  Other jobs require face-to-face interaction with clients and other employees." (internal citations omitted)); *Mason v. Avaya Commc'ns, Inc.*, 357 F.3d 1114, 1122 (10th Cir. 2004); *Hypes v. First Commerce Corp.*, 134 F.3d 721, 727 (5th Cir. 1998); *Vande Zande v. Wis. Dep't of Admin.*, 44 F.3d 538, 544 (7th Cir. 1995).  Ford has provided evidence that teamwork was integral to the resale buyer position.  One of

---

[2]The Justices of the Supreme Court have recognized the law's evolution in response to advancing technology in a number of different contexts. *See, e.g.*, *United States v. Jones*, 132 S. Ct. 945, 955, 957 (2012) (Sotomayor, J., concurring) (Alito, J., dissenting) (five members of the court expressing concern that Fourth Amendment search and seizure law must adapt to novel modes of electronic surveillance); *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 259 (2002) (Thomas, J., concurring) (reasoning that child pornography law must adapt to more sophisticated technology that produces "virtual" child pornography).

Harris's coworkers believed, based on her experience in the same position, that she could not perform effectively as a resale buyer while telecommuting.  R. 60-8 (Pompey Decl. ¶ 11) (Page ID #1095).  In addition, several members of Ford's management team expressed their business judgment that physical attendance was essential for resale buyers because face-to-face interactions facilitate group problem-solving.  R. 60-5 (King Dep. at 47–48) (Page ID #1057); R. 60-2 (Gordon Decl. ¶ 11) (Page ID #1033–34).  However, as we have discussed, advancing technology has diminished the necessity of in-person contact to facilitate group conversations.  The world has changed since the foundational opinions regarding physical presence in the workplace were issued: teleconferencing technologies that most people could not have conceived of in the 1990s are now commonplace.  Indeed, Judge Posner presciently observed in *Vande Zande* that his conclusion that "team work under supervision generally cannot be performed at home without a substantial reduction in the quality of the employee's performance" would "no doubt change as communications technology advances."  44 F.3d at 544.  Therefore, we are not persuaded that positions that require a great deal of teamwork are inherently unsuitable to telecommuting arrangements.

Moreover, our inquiry does not end simply because Ford has expressed the business judgment that face-to-face interaction is desirable.  Courts routinely defer to the business judgment of employers because courts are not equipped with the institutional knowledge to sit as "super personnel department[s]."  *See Mason*, 357 F.3d at 1122 (internal quotation marks omitted).  However, we should not abdicate our responsibility as a court to company personnel boards:  While we do not allow plaintiffs to redefine the essential functions of their jobs based on their personal beliefs about job requirements, *id.*, neither should we allow employers to redefine the essential functions of an employee's position to serve their own interests.  Rather, we should carefully consider all of the relevant factors, of which the employer's business judgment is only one.

While Ford has provided substantial evidence of its business judgment and the experience of other resale buyers, the EEOC has also offered evidence that casts doubt on the importance of face-to-face interactions at Ford.  Harris's own experience over

several years as a resale buyer indicates that in-person interaction may not be as important as Ford describes:  Even when Harris was physically present at Ford facilities, "the vast majority of communications and interactions with both the internal and external stakeholders were done via conference call."  R. 66-3 (Harris Decl. ¶ 3) (Page ID #1262–63).[3]  More fundamentally, Harris's position is not one that actually *requires* face-to-face interactions with clients.  *Cf. Melange v. City of Ctr. Line*, 482 F. App'x 81, 84 (6th Cir. 2012) (concluding that a custodian must attend his physical workplace to complete the required manual labor); *Samper*, 675 F.3d at 1239 (concluding that "on-site" attendance was an essential function of the job for a neo-natal nurse who provided direct patient care); *Brenneman*, 366 F.3d at 420 (pharmacy technician); *Nesser v. Trans World Airlines, Inc.*, 160 F.3d 442, 446 (8th Cir. 1998) (airline customer-service agent).  Although Harris needed to conduct occasional site visits with steel suppliers, R. 60-5 (King Dep. at 46) (Page ID #1057), Ford has offered no evidence to prove that Harris would be less able to perform these site visits if she worked partially, or even primarily, from her home rather than Ford's facilities.[4]  *Cf. Robert v. Bd. of Cnty. Comm'rs*, 691 F.3d 1211, 1217 & n.2 (10th Cir. 2012) (concluding that working from home was not a reasonable accommodation for an employee who was completely unable to perform

---

[3] The dissent characterizes Harris's testimony on this point as "self-serving" and dismisses it out of hand, noting that any employee could provide testimony to show that her job was suitable to telecommuting.  But the dissent fails to recognize that an employer can just as easily provide self-serving testimony that even marginal job functions are absolutely essential.  It is not our role at the summary judgment stage to assess whether testimony is believable; such credibility contests are for the trier of fact to resolve.  When reviewing a motion for summary judgment, we must accept all facts and draw all reasonable inferences in favor of the nonmovant.  Thus, we accept as true Harris's testimony that she regularly attended meetings via teleconference even while at Ford facilities.

[4] The EEOC argues that these occasional site visits do not disqualify Harris from employment as a resale buyer because she would be able to reschedule site visits if they fell on a day in which she experienced severe IBS symptoms.  Ford counters that frequent rescheduling is not an acceptable solution because it would disrupt business and strain client relationships.  Contrary to the dissent's characterization, there is no evidence in the record that Harris "was forced to routinely cancel [site visits] at the last minute"; rather, the record indicates that Harris anticipated rescheduling visits if they were ever to coincide with a day on which she was experiencing a flare-up.  There is no evidence that such a problem would necessarily arise, much less that it would occur "routinely."  The factual dispute regarding whether there is a reasonable solution to Harris's potential difficulty performing site visits should be resolved by a factfinder.  *See Crider v. Univ. of Tenn., Knoxville*, 492 F. App'x 609, 615 (6th Cir. 2012) (finding summary judgment inappropriate when an employer had not shown that there was no possible accommodation for an employee who could not conduct site visits on some days for religious reasons, in part because there was no evidence that such visits would be scheduled on those days).  Regardless, the requirement that resale buyers conduct site visits has no effect on whether physical attendance is an essential function of the position:  A site visit requires the resale buyer to leave the location where she ordinarily works, whether it be a Ford facility or the employee's home.

site visits at the time of her termination).  As additional evidence that physical presence at Ford was not an essential function of the job, the EEOC points to Ford's decision to extend telecommuting options to other resale buyers, albeit on a more limited basis than Harris's initial request.  R. 66-3 (Harris Decl. ¶ 22) (Page ID #1265).  Although Ford has provided significant evidence that physical attendance was an essential function of the resale buyer position, the EEOC has offered at least enough evidence genuinely to dispute this conclusion.

## B.  Qualification with Reasonable Accommodation

Alternatively, the EEOC can demonstrate that Harris was qualified for the resale buyer position with a reasonable accommodation for her disability, namely a telecommuting arrangement.  We have previously concluded that telecommuting is not a reasonable accommodation for most jobs, but that there may be "unusual case[s]" when telecommuting is reasonable because the "employee can effectively perform all work-related duties at home."  *Smith v. Ameritech*, 129 F.3d 857, 867 (6th Cir. 1997) (internal quotation marks omitted); *see also Tyndall v. Nat'l Educ. Ctrs., Inc.*, 31 F.3d 209, 213 (4th Cir. 1994).  However, as we noted above, the class of cases in which an employee can fulfill all requirements of the job while working remotely has greatly expanded.  The EEOC has presented sufficient evidence to create a genuine factual dispute as to whether Harris is one of those employees who can effectively work from home.

Ford argues that a telecommuting arrangement is generally not a reasonable accommodation for resale buyers because they must interact on a regular basis with other team members and access information that is unavailable during non-"core" business hours.  This argument confuses remote work arrangements with flex-time arrangements. Requests for flex-time schedules may be unreasonable because businesses cannot "operate effectively when [their] employees are essentially permitted to set their own work hours."  *EEOC v. Yellow Freight Sys., Inc.*, 253 F.3d 943, 951 (7th Cir. 2011) (en banc).  Indeed, leave on a sporadic or unplanned basis may be an unreasonable accommodation.  *See Samper*, 675 F.3d at 1240; *Buckles v. First Data Res., Inc.*, 176 F.3d 1098, 1101 (8th Cir. 1999) (finding the "[u]nfettered ability to leave work at

any time" not to be a reasonable accommodation). However, telecommuting does not raise the same concerns as flex-time scheduling because an employer can still rely on an employee to be working during scheduled hours. Harris did not request to "simply miss work whenever she felt she needed to and apparently so long as she felt she needed to." *Samper*, 675 F.3d at 1240. Instead she requested that she be able to work from home when she felt she needed to *during normal business hours*. *See Waggoner v. Olin Corp.*, 169 F.3d 481, 485 (7th Cir. 1999) (concluding that "[i]n some jobs . . . working at home for a time might be an option" for a reasonable accommodation); *Carr v. Reno*, 23 F.3d 525, 530 (D.C. Cir. 1994) (noting that "regular hours on a consistent basis" often remain a job requirement even when an employee is permitted to work from home). The arrangement Harris sought ensured that she would be available when needed to address an emergency or participate in an impromptu meeting. Ford's concern with scheduling meetings and knowing who could be relied upon to handle urgent matters, R. 60-2 (Gordon Decl. ¶ 7) (Page ID #1029), did not depend on Harris's physical presence in the office, but rather on her consistent availability during "core" hours.

Ford's arguments based on specific performance problems that arose when Harris worked remotely also confuse telecommuting with flex-time arrangements. First, Ford asserts that Harris's repeated absences forced managers to shift a portion of her responsibilities to her coworkers, which both increased other employees' workloads and strained morale. R. 60-8 (Pompey Decl. ¶ 4) (Page ID #1092–93); R. 60-2 (Gordon Decl. ¶ 8) (Page ID #1029). A proposed accommodation that burdens other employees may be unreasonable, *Brenneman*, 366 F.3d at 420 (concluding that the medical leave a pharmacy technician requested as an accommodation for his disability was not reasonable because his absence "placed a great strain on the Pharmacy Department"), but the resale- buyer position is not one that requires most of an absent employee's work to be transferred to a coworker. For many jobs, an employee must be physically present at work to perform specific tasks; when the employee is not present, those duties must necessarily shift to the absent employee's coworkers. *See Samper*, 675 F.3d at 1239–40 (neo-natal nurse); *Brenneman*, 366 F.3d at 420 (pharmacy technician); *Nesser*, 160 F.3d at 446 (airline customer service representative). Harris's resale-buyer position differs

because she does not need to interact in-person with equipment or people to perform the core functions of her job. Her coworkers were required to shoulder a portion of her work not because she was physically absent, but because Ford prohibited her from working remotely during the business day.

Second, Ford argues that Harris made pricing mistakes while working remotely because she could not immediately contact a supplier for accurate information. As with the first problem, however, this mistake arose because Ford prohibited Harris from working remotely during core business hours, when she could telephone suppliers to request accurate pricing information. Her physical presence at Ford was irrelevant: Whether working from Ford's facilities or from home, Harris would have called the supplier to obtain the necessary information. Ford has not provided any evidence that a telecommuting arrangement, as opposed to a flex-time arrangement, is inherently problematic.

Ford also argues that telecommuting is not a reasonable accommodation for Harris, compared to other resale buyers, because her request to telecommute for such a large portion of the work week was unreasonable and her previous attendance issues demonstrated she was not a suitable candidate for telecommuting. If Ford objected to Harris's request to telecommute for "up to four days per week," R. 60-10 (Pray Email) (Page ID #1100), it was Ford's responsibility to engage in an interactive process to explore reasonable alternatives. 29 C.F.R. § 1630.2(o)(3); *Kleiber*, 485 F.3d at 871. Harris was willing to discuss alternative accommodations, including a telecommuting arrangement for as few as one to two days per week. R. 66-3 (Harris Decl. ¶ 17) (Page ID #1264). Ford's failure to engage in that discussion is not evidence that a telecommuting arrangement in any form was unreasonable.[5] *Cf. Rauen v. U.S. Tobacco Mfg. Ltd. P'ship*, 319 F.3d 891, 896 (7th Cir. 2003) (finding a requested accommodation unreasonable when "the only acceptable option to [the plaintiff] was 'a home office in its entirety'").

---

[5] As we discuss below, Ford did offer several alternatives, but none were indisputably reasonable means of accommodating Harris's disability. R. 60-4 (Jirik Decl. ¶ 9) (Page ID #1049).

Second, Ford cannot use Harris's past attendance issues as a basis to deny her accommodation because her absences were related to her disability. *Humphrey v. Mem'l Hosps. Ass'n*, 239 F.3d 1128, 1137 (9th Cir. 2001). In *Humphrey*, a medical transcriptionist with obsessive compulsive disorder was consistently tardy because of ritualistic grooming behaviors in the morning. The employer denied her request for accommodation with a work-from-home arrangement, relying on its policy of not allowing such arrangements for employees with a disciplinary record. In holding that the employer was not entitled to summary judgment, the court explained that "[i]t would be inconsistent with the purposes of the ADA to permit an employer to deny an otherwise reasonable accommodation because of past disciplinary action taken due to the disability sought to be accommodated." *Id.* at 1137. We find this reasoning persuasive. In the instant case, the EEOC has presented evidence that Harris's past attendance issues were related to her IBS flare-ups. R. 60-6 (Harris Dep. at 141–46) (Page ID #1060–61). Indeed, at times Harris would begin driving to work but be unable to complete her commute without losing control of her bowels. *Id.* at 144 (Page ID #1060). Thus, Ford cannot rely on Harris's past disability-related attendance issues to disqualify her from telecommuting.[6]

Finally, Ford argues that even if Harris's request for a telecommuting arrangement was reasonable, she is not "otherwise qualified" because she rejected alternative reasonable accommodations offered by Ford. *See Hedrick*, 355 F.3d at 457. When an employer "offers a reasonable counter accommodation, the employee cannot demand a different accommodation." *Jakubowski v. Christ Hosp., Inc.*, 627 F.3d 195, 203 (6th Cir. 2010); *see also Trepka v. Bd. of Educ.*, 28 F. App'x 455, 459 (6th Cir. 2002) ("The employer need not provide the accommodation that the employee requests or prefers. Instead the employer retains the 'ultimate discretion' to choose another

---

[6]Ford also claims that Harris is not a suitable candidate for telecommuting because she was "unable to establish regular and consistent work hours" during an earlier alternative work arrangement. R. 60-3 (Gontko Decl. ¶ 3) (Page ID #1043). However, the earlier trial was based on a "flex-time" arrangement, in which Harris was permitted to work during non-"core" business hours. As discussed above, the availability and consistency problems inherent in flex-time arrangements are not necessarily present in telecommuting arrangements because the employee can maintain a standard work schedule. Therefore, Harris's unsuccessful experiment with an alternative work arrangement in the past does not doom to failure the telecommuting arrangement she requested as an accommodation.

effective accommodation."). The alternative accommodation offered by an employer, however, must adequately address the employee's unique needs and reasonably accommodate her disability.

Ford offered two alternative accommodations to Harris: (1) moving her cubicle closer to the restroom or (2) finding an alternate position within Ford more suitable to telecommuting. The EEOC has provided evidence that casts doubt on whether these alternatives address the problems Harris experienced with her IBS. For example, Harris testified that she might soil herself merely by standing up from her desk. R. 67-3 (Harris Dep. at 140) (Page ID #1384). Clearly, moving Harris to a cubicle closer to the restroom does not address her needs if she has no control over her bowels for the time it would take to reach the restroom. Nor do we consider it reasonable, as the dissent suggests, to expect an employee to suffer the humiliation of soiling herself on a regular basis in front of her coworkers, merely because she could use Depends to contain the mess or bring a change of clothes to clean herself up after the fact. Likewise, Ford's offer to assist Harris in finding an alternative position within Ford, R. 60-4 (Jirik Decl. ¶ 9) (Page ID #1049), was not a reasonable accommodation because there was no guarantee that such a position would be forthcoming. Furthermore, "reassignment of an employee is only considered when accommodation within the individual's current position would pose an undue hardship." *Cassidy v. Detroit Edison Co.*, 138 F.3d 629, 634 (6th Cir. 1998). Thus, although the employer ordinarily has the option of choosing an accommodation from among reasonable options, Ford was not entitled to force Harris to accept an alternative position in this case because the telecommuting arrangement proposed by Harris was a reasonable means of accommodating her disability.

Because the EEOC has provided evidence that Harris was qualified for the resale-buyer position with a reasonable telecommuting accommodation, the burden shifts to Ford to prove that such an accommodation would pose an undue burden.[7] It is not

---

[7]Our explanation of why Harris's proposed accommodation is reasonable also explains why such an accommodation would not impose an undue hardship on Ford: "In a case-specific context, the terms are virtually mutually exclusive in the sense that 'undue hardship' defines which accommodations an employer will be required to adopt. If an employer shows that a proposed accommodation imposes an undue hardship, then it would be 'unreasonable' to require this employer to adopt that accommodation,

sufficient that an employer shows that it will be inconvenienced in some way by the proposed accommodation: "We may assume that any accommodation would entail some hardship on the Company, but . . . undue hardship is something greater than hardship, and an employer does not sustain his burden of proof merely by showing that an accommodation would be bothersome to administer or disruptive of the operating routine." *Draper v. U.S. Pipe & Foundry Co.*, 527 F.2d 515, 520 (6th Cir. 1975) (internal quotation marks omitted). The ADA directs us to consider several factors when determining whether an accommodation imposes an undue hardship on an employer: (1) "the nature and cost of the accommodation," (2) the financial and personnel resources of the affected facility, (3) the resources of the employer as an entity, and (4) the structure and functions of the employer's workforce. 42 U.S.C. § 12111(10)(B). Although setting up a home workstation for Harris might entail some cost, considering Ford's financial resources and the size of its workforce, this cost is likely to be de minimis. Indeed, Ford has created a written policy in which it pledges to absorb these costs for all employees approved to telecommute. R. 60-11 (Telecommuting Policy at 5–6) (Page ID #1106–07). Therefore, Ford has not met its burden of proving that a telecommuting accommodation, even if reasonable, would create an undue hardship.

The EEOC has provided evidence that Harris is "otherwise qualified" for the resale-buyer position, either because her physical presence is not "essential" or because she requested a reasonable accommodation for her disability. It is important, at this juncture, to clarify that we are not rejecting the long line of precedent recognizing predictable attendance as an essential function of most jobs. Nor are we claiming that, because technology has advanced, most modern jobs are amenable to remote work arrangements. As we discussed above, many jobs continue to require physical presence because the employee must interact directly with people or objects at the worksite. *See, e.g.*, *Melange*, 482 F. App'x at 84 (custodian). We are merely recognizing that, given the state of modern technology, it is no longer the case that jobs suitable for telecommuting are "extraordinary" or "unusual." *Vande Zande*, 44 F.3d at 545; *Smith*,

─────────────

regardless whether another employer, in a different factual context, may be required to adopt that same accommodation." *Monette*, 90 F.3d at 1183 n.10.

129 F.3d at 867–68.  When we decided *Smith* in 1997, we responded to the world as it then existed; however, in the intervening years, communications technology has advanced to the point that it is no longer an "unusual case where an employee can effectively perform all work-related duties from home." *Smith*, 129 F.3d at 867–68.  In this case, we respond to the world as it exists now, and conclude that there is a genuine dispute of material fact regarding whether Harris can perform all of her job duties from a remote location.  Accordingly, we reverse the district court's grant of summary judgment on the failure-to-accommodate claim.

## IV.  ADA RETALIATION CLAIM

The EEOC argues that Harris began receiving negative reviews and was ultimately terminated in retaliation for filing an EEOC charge based on Ford's failure to accommodate her disability.  The ADA prohibits discrimination "against any individual because such individual has opposed any act or practice made unlawful by [the ADA] or because such individual made a charge . . . under [the ADA]."  42 U.S.C. § 12203(a).  A plaintiff may prove retaliation claims using the *McDonnell Douglas* burden-shifting framework: The plaintiff bears the initial burden of proving a prima face case, then the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions, and finally the burden shifts back to the plaintiff to prove that the defendant's proffered reason is pretext for discrimination.  *See Penny v. United Parcel Serv.*, 128 F.3d 408, 417 (6th Cir. 1997).

To establish a prima facie case of retaliation, a plaintiff must show that (1) she engaged in protected activity, (2) she suffered an adverse employment action, and (3) there was a causal link between the protected activity and the adverse employment action.  Harris's EEOC charge filed on April 23, 2009 was "protected activity," *see* 42 U.S.C. § 12203(a), and her subsequent poor performance reviews and termination were adverse employment actions.  The EEOC has also provided evidence of a causal connection between the EEOC charge and Harris's poor reviews and termination. Because approximately four months passed between the EEOC charge and Harris's termination, temporal proximity alone does not establish causation in this case.  *See*

*Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008) (reasoning that temporal proximity alone was sufficient to establish causation when an employer terminated an employee on the same day that he learned of the employee's EEOC complaint). However, a plaintiff can prove causation when she can "couple temporal proximity with any . . . other evidence of retaliation." *Id.* at 525. A relatively short period of time elapsed between Harris's EEOC charge in late April and her ultimate termination in early September, and the EEOC has presented evidence that other retaliatory conduct also occurred during this period. For example, after Harris filed her EEOC charge, her immediate supervisor began conducting intimidating one-on-one meetings with her and held a meeting with all of her coworkers to discuss her attendance problems. R. 60-6 (Harris Dep. at 218–24) (Page ID #1066–67); R. 60-2 (Gordon Decl. ¶ 19) (Page ID #1038). Harris also began receiving negative performance reviews for the first time after she filed her EEOC charge. R. 60-16 (2009 Interim Perf. Rev.) (Page ID #1140–42). Taken together, the examples of negative treatment from Ford supervisors along with the close temporal proximity between the EEOC charge and Harris's termination, are sufficient evidence to create a genuine dispute as to the existence of a causal connection.

Ford responds to Harris's prima facie case of retaliation by asserting that its decision to place her on a PEP and terminate her were legitimate and nondiscriminatory business decisions made in response to her negative performance reviews. Although Harris was under the impression that her performance was strong enough to earn an "excellent plus" evaluation, Ford consistently rated Harris as falling within the bottom quartile of her peer group. R. 60-2 (Gordon Decl. ¶ 13) (Page ID #1034–35). Harris's performance reviews and testimony from her supervisors demonstrate that she struggled with several important metrics of job performance, including interpersonal relations, keeping current on paperwork, and completing accurate purchase orders. *Id.* ¶¶ 13–25 (Page ID #1034–40). Furthermore, after Harris was placed on a PEP, she failed to achieve any of the objectives identified in the plan. *Id.* ¶¶ 20–25 (Page ID #1039–40). These critical failings provided a legitimate basis upon which Ford could have decided

to take disciplinary action against Harris and, after she failed to improve, terminate her employment.

Thus, the burden shifts back to the EEOC to prove that Ford's proffered reason for terminating Harris is pretext for discrimination. Once a plaintiff has established a prima facie case, summary judgment is ordinarily inappropriate because the question of pretext centers on a factual inquiry: "[I]n discrimination and retaliation cases, an employer's true motivations are particularly difficult to ascertain, thereby frequently making such factual determinations unsuitable for disposition at the summary judgment stage." *Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 564 (6th Cir. 2004) (citing *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 716 (1983)). A plaintiff can show that an employer's purported reason for taking an adverse employment action is pretextual if it (1) "had no basis in fact," (2) "did not actually motivate the employer's action," or (3) was "insufficient to motivate the employer's action." *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009).

When viewed in a light favorable to Harris, the evidence suggests that Harris's performance failings did not actually motivate Ford's decisions to discipline her and terminate her employment. Although many of Harris's performance deficiencies were ongoing problems, they prompted a negative review only after Harris filed her EEOC charge. *Compare* R. 60-14 (2006 Perf. Rev.) (Page ID #1130–35); R. 60-12 (2007 Perf. Rev.) (Page ID #1117–22); R. 60-13 (2008 Perf. Rev.) (Page ID #1123–29) *with* R. 60-16 (2009 Interim Perf. Rev.) (Page ID #1140–42). In addition, a reasonable jury could infer that the PEP was designed to set Harris up to fail: One of Harris's PEP goals was to eliminate a backlog of paperwork, *id.* ¶ 22 (Page ID #1039), but Harris testified that the paperwork was pending only because she needed to wait on responses from suppliers and coworkers.[8] R. 60-6 (Harris Dep. at 264) (Page ID #1077). Viewed in a light

---

[8]The dissent challenges our conclusion that a reasonable jury could conclude that the PEP set Harris up to fail by noting that the paperwork tasks designated in the PEP "were important duties of the resale buyer position." That is true, but the question is not whether the duties identified in the PEP were integral to the position; rather, the question is whether the duties were achievable within the 30-day window provided for in the PEP. On review of a motion for summary judgment, we accept as true Harris's testimony that she was unable to complete her paperwork because she needed information from coworkers and suppliers that was not forthcoming. Therefore, drawing all reasonable inferences in Harris's favor,

No. 12-2484        *EEOC v. Ford Motor Co.*                                Page 22

favorable to Harris, this evidence creates a genuine dispute as to whether Ford was truly motivated by retaliatory intent or by a reasoned business decision to terminate an underperforming employee.  The EEOC has presented evidence on which a reasonable jury could conclude that Ford retaliated against Harris for filing a charge of discrimination with the EEOC.  Therefore, we reverse the district court's grant of summary judgment.

## V.  CONCLUSION

For the foregoing reasons, we **REVERSE** the district court's grant of summary judgment to Ford and **REMAND** for further proceedings consistent with this opinion.

---

a reasonable jury could conclude that the PEP was designed in a way that prevented her from being successful.

---

## DISSENT

---

McKEAGUE, Circuit Judge, dissenting.   The majority holds that a telecommuting arrangement allowing an employee to telecommute four out of five days of the workweek on a spur-of-the-moment, unpredictable basis is a reasonable accommodation under the ADA for a position that involves routine face-to-face interactions.  The stated law of this circuit, however, is that attending work on a regular, predictable schedule is an essential function of a job in all but the most unusual cases, namely, positions in which *all* job duties can be done remotely.  The majority further holds that an employee's flat-out rejection of an employer's offer to help her find another position does not constitute an alternative reasonable accommodation, despite the fact that the reason talks could not evolve to a point of identifying a specific position was because of the employee's refusal to consider the possibility.  Finally, the majority holds that terminating an employee for repeated performance and interpersonal shortfalls could be a pretext for discrimination, even when these shortfalls are undisputed, because the employee filed an EEOC charge.  But this circuit requires more: the EEOC must *prove* that Ford's proffered reason is pretext for discrimination, and this the EEOC fails to do.  Rather than applying these well-established standards, the majority departs from precedent and fails to credit the overwhelming, uncontroverted evidence offered by Ford.  Because I disagree with the majority's analysis of the ADA discrimination claim as well as the ADA retaliation claim, I respectfully dissent.

I.

A.

The EEOC has simply failed to show that Harris could perform the essential functions of her job while telecommuting up to eighty percent of the workweek, or four out of five days, on an unpredictable schedule.  The ADA protects qualified individuals "who, with or without reasonable accommodation, can perform the essential functions of the employment position[.]" 42 U.S.C. § 12111(8). The ADA requires courts to

consider the employer's business judgment when determining the essential functions of a job. *Keith v. Cnty. of Oakland*, 703 F.3d 918, 925 (6th Cir. 2013). Moreover, this court has flatly held that "[a]n employee who cannot meet the attendance requirements of the job at issue cannot be considered a qualified individual protected by the ADA." *See Gantt v. Wilson Sporting Goods Co*., 143 F.3d 1042, 1047 (6th Cir. 1998) (internal quotation marks omitted); *see also Keith*, 703 F.3d at 923 ("The ADA defines 'discriminate' to include the failure to provide reasonable accommodation to an otherwise qualified individual with a disability, unless doing so would impose an undue hardship on the employer's business.").

The majority states that Harris was a qualified individual based on two theories: either by eliminating the requirement of regular, predictable job attendance, or by permitting an unpredictable telecommuting arrangement that served as a work-around to regular job attendance. These "alternatives" are two sides of the same coin. Really, the EEOC's ADA discrimination claim turns on one question, summed up by one of our sister circuits as follows: "Just how essential is showing up for work on a predictable basis?" *Samper v. Providence Saint Vincent Med. Ctr*., 675 F.3d 1233, 1235 (9th Cir. 2012).[1]

This circuit has already addressed that question, and held that "excessive absenteeism" renders an individual unqualified under the ADA as a matter of law, *Brenneman v. MedCentral Health Sys*., 366 F.3d 412, 419 (6th Cir. 2004), except in the "unusual case where an employee can effectively perform *all* work-related duties at home" without a substantial reduction in the quality of performance, *Smith v. Ameritech*, 129 F.3d 857, 867 (6th Cir. 1997) (emphasis added). The majority cannot contend that

---

[1] In addressing regular workplace attendance in the context of ADA discrimination claims, the Ninth Circuit reasoned as follows:

> Indeed, [the employee's] request [to not show up for work] so far exceeds the realm of reasonableness that her argument leads to a breakdown in well-established ADA analysis. In most cases, the essential function and reasonable accommodation analyses are separate: first, a court inquires as to the job's essential functions, after which the plaintiff must establish that she can perform those functions with or without reasonable accommodations. [Here, the employee] essentially asks for a reasonable accommodation that exempts her from an essential function, causing the essential functions and reasonable accommodation analyses to run together.

*Samper*, 675 F.3d at 1240 (internal citation omitted).

Harris's circumstances constitute such an "unusual case," and so the majority instead asserts that regular, predictable attendance is not an essential function of all jobs, states that Harris's position does not actually *require* showing up for work—despite the undisputed evidence in the record that many resale buyer duties could not be done at home—and notes that technology has advanced. I would instead follow this court's well-established precedent and affirm the district court's grant of summary judgment to Ford.

This court's precedent clearly states that an employee who cannot satisfy an employer's basic attendance requirements is unqualified under the ADA as a matter of law. *Brenneman*, 366 F.3d at 418–19. We based our conclusion on evidence that the employee's being absent from the workplace created strain on his coworkers, and on testimony from the employee's supervisor that attendance was an essential function of the position. *Id.* at 420. Of course, Ford has presented such evidence here: Ford's managers, as well as the other resale buyers, are in universal agreement that the resale buyer position requires face-to-face communications, and Harris's chronic, unpredictable absences—as well as the repeated errors she made while working from home—created considerable strain on the rest of the team. Yet the majority fails to credit this evidence, dismissing the commonsense conclusion that regular, predictable attendance is an essential function of almost every job, a move at odds with not only this circuit's precedent but also the case law of our sister circuits. *See, e.g.*, *Colón-Fontánez v. Municipality of San Juan*, 660 F.3d 17, 33 (1st Cir. 2011) ("This Court—as well as the majority of circuit courts—has recognized that attendance is an essential function of any job." (internal quotation marks omitted)); *Vandenbroek v. PSEG Power, CT LLC*, 356 F. App'x 457, 460 (2d Cir. 2009) (noting that "regularly attending work is an essential function of virtually every job" (internal quotation marks omitted)); *Mason v. Avaya Commc'ns, Inc.*, 357 F.3d 1114, 1119 (10th Cir. 2004) (observing the conclusion of most courts that "physical attendance in the workplace is itself an essential function of most jobs"); *EEOC v. Yellow Freight Sys., Inc.*, 253 F.3d 943, 949 (7th Cir. 2001) (en banc) ("Common sense dictates that regular attendance is usually an essential function in most every employment setting; if one is not present, he is usually unable to perform his

job."); *Davis v. Florida Power & Light Co.*, 205 F.3d 1301, 1306 (11th Cir. 2000) (noting that job presence is "an essential function of a job"); *Browning v. Liberty Mut. Ins. Co.*, 178 F.3d 1043, 1048 (8th Cir. 1999) ("Further, it is axiomatic that in order for [an employee] to show that she could perform the essential functions of her job, she must show that she is at least able to show up for work.").

Moreover, we addressed whether the ADA compels employers to provide work-at-home arrangements in *Smith v. Ameritech*, and held that an employee's requested accommodation to telecommute, in light of his job duties, was unreasonable as a matter of law. 129 F.3d at 867–68. We determined that it would only be the "unusual case where an employee can effectively perform *all* work-related duties at home" that would create a genuine issue of fact. *Id.* (emphasis added). We reasoned that the ADA does not require employers to permit work-at-home arrangements when they adversely affect productivity and work performance. *Id.* at 867. The EEOC falls far short of establishing that this is the "unusual case" because Harris cannot complete "*all* work-related duties at home." *Id.* (emphasis added). I agree with the majority that teleconferencing is more commonplace today, and that the class of jobs in which all duties can be done at home has likely increased over the last few years. However, the fact that some *other* jobs may now fit these criteria does not help the EEOC's case, because such abstractions do not transform the resale buyer position into one of the jobs in which all duties may be done from home.[2] Ford has offered overwhelming evidence to support its business judgment that impromptu meetings and problem-solving with the resale buyer team were most effectively handled face-to-face. The EEOC even concedes that the resale buyer position required in-person supplier-site visits, an important job duty that Harris by definition cannot perform from home. And yet the majority fails to credit this evidence and apply this circuit's well-established standard.

_____

[2]Additionally, the majority's discussion of flex-time arrangements as compared to telecommunication arrangements does not change the analysis. Again, the law of this circuit is that regular, predictable work attendance is essential except in very unusual cases. *See Ameritech*, 129 F. 3d at 867. Harris's case simply does not meet that requirement. And the reality of the resale buyer position is that it requires in-person site visits and face-to-face teamwork, neither of which can be completed via telecommunication, regardless of whether Harris is available from home during normal work hours.

The evidence offered by the EEOC on which the majority rests its conclusion consists only of the fact that Ford provided other resale buyers with the option of telecommuting on a more limited basis, and Harris's self-serving testimony that the "vast majority" of her job could be completed pursuant to a telecommuting arrangement. First, the EEOC's mention of Ford's telecommuting policy,[3] specifically Ford's flexibility in offering other resale buyers the option of telecommuting one to two days per week on a predictable schedule—provided that the telecommuting resale buyer would report to work should an emergency arise—does nothing to advance the EEOC's claim that unpredictable attendance, or that telecommuting up to four days per week, is reasonable for resale buyers. The difference between one or two days versus four days speaks for itself. Furthermore, in ignoring the difference between predictable and unpredictable attendance, the majority fails to recognize that an "employer is generally permitted to treat regular attendance as an essential job requirement and *need not accommodate erratic or unreliable attendance*." *Basden v. Prof'l Transp., Inc.*, 714 F.3d 1034, 1037 (7th Cir. 2013) (emphasis added).

Second, Harris's personal opinion that her work could be done via telecommuting is also insufficient to raise a genuine issue of fact. There is a good reason courts "are reluctant to allow employees to define the essential functions of their positions based solely on their personal viewpoint and experience." *Mason*, 357 F.3d at 1122. This is because any employee could provide a court with "self-serving testimony" that her job was amenable to telecommuting. *Id.* Harris's subjective opinion lacks any support in the record, as the universal judgment of all of Ford's managers and the other resale buyers refutes what Harris claims. And the EEOC cannot contest the repeated pricing and reporting errors that Harris made while working from home. Without requiring more evidence than a plaintiff's self-serving testimony, the majority has dramatically reduced what a plaintiff must show in order to withstand a summary judgment motion in an ADA discrimination claim.

---

[3]It bears mentioning that Ford's telecommuting policy makes clear that telecommuting is not an entitlement and that a specific telecommuting schedule unique to each employee must be approved in advance.

The majority, however, reasons that this case is different—not the "unusual case" described in our case law, *see Ameritech*, 129 F.3d at 867, but different—because Harris's position does not actually *require* face-to-face interactions. Except that it does: the record is clear that the position requires supplier-site visits, which by definition need to occur face-to-face.[4] It also bears mentioning that the position requires extensive teamwork with the resale buyer team, which includes impromptu meetings. I agree with our sister circuits that regularly attending work on a predictable schedule is an essential function of a job that requires such teamwork. *See Samper*, 675 F.3d at 1237 ("Sometimes [regular work attendance] is required simply because the employee must work as part of a team." (internal quotation marks omitted)); *Mason*, 357 F.3d at 1122 ("[P]hysical attendance at the administration center was an essential function of the service coordinator position because the position required . . . teamwork.") *Hypes v. First Commerce Corp.*, 134 F.3d 721, 727 (5th Cir. 1998) ("Furthermore, he was a part of a team and the efficient functioning of the team necessitated the presence of all members . . . it was critical to the performance of his essential functions for [the employee] to be present in the office regularly and as near as possible to normal business hours."); *Vande Zande v. Wisconsin Dep't of Admin.*, 44 F.3d 538, 545 (7th Cir. 1995) ("Most jobs in organizations public or private involve team work . . . it would take a very extraordinary case for the employee to be able to create a triable issue of the employer's failure to allow the employee to work at home."). Even the EEOC's own guidance recognizes that an employer is justified in refusing a telecommuting request when, among other things, it would be difficult for a telecommuting employee to participate in frequent "impromptu team meetings" to address ongoing developments. EEOC, Employer Best Practices for Workers with Caregiving Responsibilities, http://www.eeoc.gov/policy/docs/caregiver-best-practices.html (last visited Feb. 11, 2014). Instead of acknowledging this commonsense notion, or affording deference to Ford's business judgment, the majority does precisely what it claims not to do: it acts as

---

[4] Ford has in fact offered evidence to prove that Harris was unable to perform these site visits under her proposed arrangement. As the majority notes, Harris was absent from work more often than not. If Harris's condition is severe enough that she cannot reliably report to Ford's facilities, then she would also not be able to reliably report to the supplier sites for the scheduled visits. Clearly, the fact that Harris could not complete the site visits on schedule is why she was forced to routinely cancel them at the last minute, a practice that frustrated Ford's suppliers.

a "super personnel department," deciding which positions actually *require* face-to-face interactions and which do not. *See Mason*, 357 F.3d at 1122 (internal quotation marks omitted).

Similarly unconvincing is the majority's observation that "technology has advanced" or that the "world has changed." The fact is that this circuit has reaffirmed the principle that regular attendance is an essential function of almost all jobs as recently as 2012. *See Melange v. City of Ctr. Line*, 482 F. App'x 81, 84 (6th Cir. 2012). But even holding this affirmance aside, I cannot identify anything in the record evidencing a change in the world, let alone anything in the majority opinion explaining how it is a new world in relation to this employee. In this case, the EEOC insists that most—again, not all—of Harris's work could be done using email or computers, and Harris claims that she could interact with stakeholders via conference call. While the majority dismisses our precedent in *Ameritech* and *Brenneman* on the basis that these are "early cases," it cannot be said that email, computers, or conference call capabilities were not available in 1997 or 2004, when these cases were decided. No new technologies are identified by the EEOC or the majority because none are implicated by the facts of this case. As to whether anything has specifically changed in the world with respect to this job in the years since *Ameritech* and *Brenneman* were decided, I can only conclude that the answer is no. I would follow this circuit's well-established precedent and affirm the district court's grant of summary judgment to Ford on the ADA discrimination claim.

## B.

Harris also is not a qualified individual under the ADA for the separate reason that she rejected reasonable accommodations offered by Ford. "It is well-settled that 'an employee cannot make his employer provide a specific accommodation if another reasonable accommodation is instead provided.'" *Keever v. City of Middletown*, 145 F.3d 809, 812 (6th Cir. 1998) (quoting *Hankins v. The Gap*, 84 F.3d 797, 800–01 (6th Cir. 1996)). And it is well-established that the "ultimate discretion to choose between effective accommodations" lies with the employer. *Hankins*, 84 F.3d at 800.

No. 12-2484        *EEOC v. Ford Motor Co.*                Page 30

Because Harris refused all of Ford's offers to accommodate her, she cannot demand that Ford provide her with a wholly unpredictable telecommuting schedule.

The first accommodation that Harris refused was Ford's offer to move Harris's cubicle closer to the restroom. The majority is correct to note Harris's testimony that she might soil herself merely by standing up, and so it is possible that this accommodation, when viewed in isolation, would not address the challenges caused by her medical condition. But Harris also refused to consider, either in conjunction with having her cubicle moved or separately, wearing Depends, a product designed for incontinence, which would have addressed that challenge. Harris also refused to consider, either in conjunction with having her cubicle moved or separately, bringing a change of clothes to the workplace, which would also have addressed that challenge.

The second accommodation that Harris refused was Ford's offer to assist her in finding within Ford another position with duties more amenable to the frequent, unpredictable telecommuting schedule that she wanted. This court has held that an employer who offers an employee another position has offered that employee a reasonable accommodation. *Keever*, 145 F.3d at 813. Harris rejected Ford's offer because she did not want to "start anew." Unlike the majority, I would find that Harris's refusal to even consider the possibility of another job does not raise an issue of material fact as to whether the offered accommodation was reasonable. Clearly, the reason talks between Ford and Harris never evolved to a place where a specific position was identified was because of Harris's unwillingness to entertain the idea.[5] Under the majority's logic, had Harris not flat-out rejected Ford's offer but considered it in earnest, only to later refuse to transfer to a different position out of a fear of "starting anew," *this* would constitute a refusal of a reasonable accommodation. Apparently, an employee who is even less agreeable, who refuses the possibility of the idea at the onset, deserves a different outcome. I disagree. I would find that Harris's flat-out rejection of Ford's

_____

[5]Not to mention, the record shows that Harris was difficult to engage in discussion. For example, during the meeting at which the resale buyer team attempted to allocate Harris's workload among the other team members, her coworkers initially found her confrontational. After Harris became emotional and fled the meeting, her coworkers later found her "screaming and crying" in the company restroom, which drove Ford to call security.

offer to transition her to a position more amenable to her scheduling needs did not render Ford's proposed accommodation unreasonable. I would therefore affirm the district court's grant of summary judgment to Ford on the ADA discrimination claim on this alternative basis.

## II.

Secondly, the EEOC simply cannot demonstrate that Ford's reason for terminating Harris's employment was a pretext for discrimination. In this circuit, an employer's "proffered reason cannot be proved to be a pretext 'unless it is shown both that the reason was false, *and* that discrimination [or retaliation] was the real reason.'" *Harris v. Metro. Gov't of Nashville & Davidson Cnty., Tenn.*, 594 F.3d 476, 486 (6th Cir. 2010) (quoting *Saint Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993)) (emphasis in original). The EEOC cannot prove either of these points, and so summary judgment for Ford on the EEOC's ADA retaliation claim should be affirmed.

The EEOC admits that Harris frequently did not complete her work and that she had numerous performance and interpersonal issues. Her performance issues included not updating spreadsheets, not doing paperwork, not scheduling required training sessions, not pricing items correctly, and not completing timetables for finishing projects. Her performance issues as well as her interpersonal difficulties caused Ford financial loss and harmed its customer service operations. The majority's claim that a reasonable jury could find that Harris's PEP was designed to set Harris up to fail is meritless given the fact that the parties do not dispute that the PEP tasks which Harris failed to complete—such as doing her paperwork—were important duties of the resale buyer position. Clearly, the fact that Harris's performance was deficient is why her performance reviews suffered. The EEOC does not prove otherwise, thus the EEOC has not met its burden to prove that Ford's proffered reason was false, or that discrimination was the real reason that Ford terminated her employment. *See id.* I would therefore affirm the district court's grant of summary judgment to Ford on the ADA retaliation claim.

### III.

My disagreement with the majority on the ADA discrimination and retaliation claims aside, it bears mentioning the unfortunate impact that this case will have on employees working for companies in this circuit. Again, the EEOC does not dispute that the resale buyer job required face-to-face interactions that cannot be done via telecommunication. Rather, during oral argument, the EEOC summed up its position as follows: "If that part of the [resale buyer] work is so critical and spontaneous that you can't predict when it's going to happen, then it doesn't make sense for Ford to let anybody telecommute ever. Yet [Ford does] let people telecommute, people doing the exact same job as [Harris] is." So the lesson for companies from this case is that, if you have a telecommuting policy, you have to let every employee use it to its full extent, even under unequal circumstances, even when it harms your business operations, because if you fail to do so, you could be in violation of the law. Of course, companies will respond to this case by tightening their telecommuting policies in order to avoid legal liability, and countless employees who benefit from generous telecommuting policies will be adversely affected by the limited flexibility. Especially in light of the fact that our precedent counsels otherwise, I find this outcome regrettable. For the reasons stated above, I respectfully dissent.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 12-2484

EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION,
           Plaintiff - Appellant,

    v.

FORD MOTOR COMPANY,
           Defendant - Appellee.

> **FILED**
> *Apr 22, 2014*
> DEBORAH S. HUNT, Clerk

Before: MOORE and McKEAGUE, Circuit Judges; HELMICK, District Judge.

**JUDGMENT**

On Appeal from the United States District Court
for the Eastern District of Michigan at Ann Arbor.

THIS CAUSE was heard on the record from the district court and was argued by counsel.

IN CONSIDERATION WHEREOF, it is ORDERED that the district court's grant of summary judgment to Ford Motor Company is REVERSED, and the case is REMANDED for further proceedings consistent with the opinion of this court.

**ENTERED BY ORDER OF THE COURT**

_____
Deborah S. Hunt, Clerk